# MEMO ENDORSED

Defendants are directed to file an opposition, if any, by January 8, 2024.

SO ORDERED.

Edgardo Ramos, U.S.D.J.
Dated: December 18, 2024
New York, New York

**Franklin Mendez**
111 Sunken Garden Loop, Apt. 316
New York, NY 10035
Email: fmendez3327@gmail.com
Phone: 646-641-6805

December 12, 2024



RECEIVED
DEC 16 2
PRO SE OFFICE

**Pro Se Office**
Southern District of New York
500 Pearl Street
New York, NY 10007

**Honorable Judge Edgardo Ramos**
Southern District of New York
Thurgood Marshall Courtroom 619
United States Courthouse
40 Foley Square
New York, New York 10007

**Franklin Mendez v. Molly Waslow Park and The City of New York**
**Case No.: 24-cv-2486 (ER)(BM)**

## Notice of Motion for Reconsideration Under Federal Rule of Civil Procedure 60(b)(2) and Request for Sanctions Under Federal Rule of Civil Procedure 11 for Violations of ADA, RA, FHA, and Misrepresentation of Federal Compliance

### INTRODUCTION

Plaintiff, a legally blind individual, respectfully submits this motion for reconsideration under **Rule 60(b)(2) of the Federal Rules of Civil Procedure,** based on newly discovered evidence that directly contradicts the defendants' representations to the Court. Plaintiff also seeks sanctions against the defendants under **Rule 11(c)** of the **Federal Rules of Civil Procedure** for their deliberate misrepresentations to the Court and violations of federal accessibility and anti-discrimination laws, including the **Americans with Disabilities Act** (ADA), **Section 504 of the Rehabilitation Act** (RA), and the **Fair Housing Act** (FHA).

**RELIEF REQUESTED**

Plaintiff respectfully requests that this Honorable Court, located at 40 Foley Square, Courtroom 619, conduct a hearing to consider newly discovered evidence and to determine the appropriate sanctions against the defendants on this ___ day of January 2025. The Plaintiff seeks an order stating that the newly discovered evidence warrants reconsideration of the Court's prior injunction ruling and the pending injunction, as well as a modification of it. Additionally, the Plaintiff asserts that the defendants engaged in bad faith, which justifies the imposition of sanctions against them. The Plaintiff requests the following relief:

1. Reconsideration of the Court's previous injunction rulings and the pending injunction based on the newly discovered evidence outlined in this motion, including a modification requiring the Department of Social Services (DSS) to effectively utilize its housing teams and housing portfolio.
2. A hearing to address this motion for reconsideration and the request for sanctions.
3. Sanctions against the defendants for their misconduct, including, but not limited to, an order requiring the defendants to pay the Plaintiff's reasonable attorneys' fees and costs incurred as a result of the defendants' misrepresentations and violations of federal law.
4. Any other relief the Court deems just and proper.

**CONCLUSION**

In light of the newly discovered evidence and the defendants' persistent misrepresentations, the Plaintiff respectfully urges the Court to reconsider its previous injunction ruling and the pending injunction and modify to include DSS utilize its housing teams and housing portfolio and to impose sanctions against the defendants for their violations of federal laws designed to protect individuals with disabilities.

Sincerely,

Franklin Mendez

**Evidence in Support of Motion for Reconsideration and Sanction**

The following uncontroverted documentary evidence is hereby submitted in support of the motion for reconsideration, newly discovered evidence, and for sanctions:

1. **Exhibit A:** DiNapoli, T. P. (2024, October 31). *Homeless New Yorkers relying on CityFHEPS face significant delays for permanent housing: Audit finds rental assistance program plagued with problems while costs grow.* New York State Comptroller. Retrieved from https://www.osc.ny.gov/press/releases/2024/10/dinapoli-homeless-new-yorkers-relying-cityfheps-face-significant-delays-permanent-housing.

2. **Exhibit B:** HELP USA. (n.d.). *Permanent housing developments.* Retrieved from https://www.helpusa.org/.

3. **Exhibit C:** HELP USA. (2024). *HELP USA's $129 million investment in East New York opens with 255 affordable and supportive apartments, featuring 154 units reserved for formerly homeless adults and young families with children.* Retrieved from https://www.helpusa.org/help-usas-129-million-investment-in-east-new-york-opens-with-255-affordable-and-supportive-apartments-featuring-154-units-reserved-for-formerly-homeless-adults-and-young-families-with-children/.

4. **Exhibit D:** HELP USA. (2024). *HELP USA selected for Citi Foundation's 2024 Global Innovation Challenge.* Retrieved from https://www.helpusa.org/help-usa-selected-as-one-of-fifty-worldwide-organizations-for-citi-foundations-2024-global-innovation-challenge/.

5. **Exhibit E:** Email Communication from Counsel Vyas: On May 9, 2024, Counsel Jaimini Vyas, representing the Department of Law, communicated with the plaintiff, Franklin Mendez, via email. The email included a link to the New York City Housing Preservation and Development (HPD) webpage, which provides resources for individuals seeking to apply for a 2% set-aside apartment designated for people with disabilities.
   - From: Vyas, Jaimini (LAW) JVyas@law.nyc.gov
   - Sent: May 9, 2024, 5:45 PM
   - To: Mendez, Franklin fmendez3327@gmail.com

6. **Exhibit F:** Zoom Company Information: HELP USA Inc. (2024). November 2024. Available at: www.helpusa.org. Address: 115 E 13th St, Fl 17, New York City, NY 10003. Telephone: (212) 400-7000. Revenue: USD $60,294,000. Employees: 644. Industry: Non-Profit & Charitable Organizations.

7. **Exhibit G:** LexisNexis® Corporate Affiliations™, Help USA Inc., Company Overview and Financial Data. December 9, 2024. RELX Inc., available at LexisNexis database. Financial data indicate USD $10,000,000–$24,999,999 in sales. Headquarters: 115 E 13th St, New York, NY 10003.

8. **Exhibit H:** Guidestar. *Help USA Inc., Company Profile and Financial Data.* October 4, 2024. Retrieved from Guidestar database: https://www.guidestar.org/profile/13-3922973. Financial data for fiscal year 2023 include total contributions of USD $3,000,000, total revenue of USD $3,213,190, total assets of USD $20,915,398, and net assets of USD $7,487,739. Principal Officer: Tasha Jackson. Audit firm: Baker Tilly US LLP.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**Franklin Mendez, Plaintiff,**

**v.**                                      **Case No.: 24-cv-2486 (ER)(BM)**

Molly Waslow Park and The City of New York, et. al, Defendants.

## Affidavit in Support of Notice of Motion for Reconsideration Under Federal Rule of Civil Procedure 60(b)(2) and Request for Sanctions Under Federal Rule of Civil Procedure 11 for Violations of ADA, RA, FHA, and Misrepresentation of Federal Compliance

### ARGUMENT

#### I. Newly Discovered Evidence Justifies Reconsideration of Pending Injunction and the Court's Prior Injunction Rulings

Under **Rule 60(b)(2)** of the **Federal Rules of Civil Procedure**, a party may seek relief from a judgment based on newly discovered evidence that meets specific criteria:

1. **The evidence must be newly discovered.** The evidence cannot have been known to the moving party at the time of the original judgment. In this case, the Plaintiff has uncovered significant new evidence through the <u>New York State Comptroller's Audit</u>, which provides critical insights into the Department of Social Services (DSS) and Department of Homeless Services (DHS) practices regarding housing assistance for individuals experiencing homelessness.

2. **The evidence could not have been discovered earlier with reasonable diligence.** The information contained in the audit was not available to the Plaintiff prior to the judgment, despite reasonable efforts to obtain relevant documents and information. The audit findings

represent an official review conducted by the State Comptroller, which the Plaintiff could not have independently accessed or anticipated during earlier stages of litigation.

3. **The evidence is likely to alter the outcome of the case.** The newly discovered evidence directly contradicts the defendants' prior assertions to the Court, particularly their claims regarding the existence of a housing portfolio and their obligations to assist the Plaintiff in securing housing. This information is pivotal in evaluating the merits of the defendants' positions and the basis for the Court's prior injunction rulings.

The newly uncovered evidence demonstrates that DSS and DHS:

1. **Publicly advertised comprehensive housing search assistance.** DSS and DHS have claimed to provide extensive housing assistance to homeless individuals, stating in response to the Comptroller's audit that:

> *"Housing search assistance begins 'from day one' and continues throughout a client's stay in shelter. Utilizing DSS and DHS apartment search team and the Public Engagement Unit and housing portfolio."* **(See Exhibit A,** <u>Comptroller's Audit</u>, page 30, Recommendation 4*)*.

However, the audit findings highlight a significant lack of support for these claims:

> *"Despite our numerous meetings with DSS officials, there was no mention of the DHS apartment search team and the Public Engagement Unit during the audit or in response to our preliminary reports."* **(See Exhibit A,** <u>Comptroller's Audit</u>, page 30, Recommendation 4).

2.  **Misrepresented their obligations to the Court.** The defendants have claimed that no housing portfolio or housing team exists and that DSS and DHS bear no responsibility to assist the Plaintiff in securing housing. This misrepresentation persisted throughout the proceedings, including during the May 9th injunction hearing, where the Court inquired about the availability of housing assistance. (Transcripts Injunction May 9th, 2024)

3.  **Directed shelter providers to place the burden of finding housing on clients.** Contrary to their public statements, DSS directed shelter providers, such as HelpSec (an affiliate of HelpUSA), to instruct residents—including the blind Plaintiff—to conduct their own housing searches. This directive contradicts DSS's advertised policies regarding housing assistance and federal compliance, as highlighted in the Comptroller's Audit:

> *"DSS' Policy Bulletin and the Shopping Letters issued to clients state that it is the clients' responsibility to look for and find housing."* **(See Exhibit A,** <u>Comptroller's Audit</u>, page 30, Recommendation 4).

Furthermore, the audit documented that shelter providers confirmed this practice:

> *"The shelter provider we visited informed us that, while they recommend brokers, it is incumbent on the client to search for apartments. This directive was communicated to the non-profit shelter contracted by DSS, as confirmed during the Comptroller's Audit."* **(See Exhibit A,** <u>Comptroller's Audit</u>, page 30, Recommendation 4).

This newly discovered evidence not only contradicts the defendants' previous representations to the Court but also calls into question the validity of the Court's prior and pending

injunction rulings, warranting reconsideration of the injunction based on this significant new information.

In light of the newly discovered evidence, the Plaintiff respectfully asserts that reconsideration of the injunction is justified, supported by established legal principles and case law pertaining to **Rule 60(b)** motions. The Supreme Court has held that a party may be entitled to relief based on new evidence that could not have been discovered through reasonable diligence. For instance, in ***Gonzalez v. Crosby***, 545 U.S. 524 (2005), the Court emphasized that new evidence may warrant relief under **Rule 60(b)(2)** if it meets the criteria set forth in the rule.

The relevance of this newly discovered evidence to the Plaintiff's claims under the ADA, RA, and FHA is underscored by the Supreme Court's recognition of the obligations of state entities to provide adequate services to individuals with disabilities. In ***United States v. Georgia***, 546 U.S. 151 (2006), the Court confirmed that state entities could be held accountable for failing to provide adequate services to individuals with disabilities, reinforcing the obligation of agencies to uphold their commitments under federal law. Additionally, in ***Tennessee v. Lane***, 541 U.S. 509 (2004), the Court recognized the right of individuals with disabilities to access courts and the legal system, highlighting the need for accommodations that ensure equal access.

Given these precedents and the newly uncovered evidence, the Plaintiff respectfully requests that the Court reconsider the pending injunction and its previous rulings, as the integrity of the judicial process and the principles of justice necessitate a thorough examination of the facts

presented[1].

## II. Defendants' Misrepresentations Undermine the Integrity of These Proceedings

The defendants' actions represent a deliberate attempt to mislead both the Court and the public, thereby undermining the integrity of these proceedings. Their conflicting narratives reveal a pattern of deceit that obstructs the Plaintiff's pursuit of equitable relief:

1. **Public Claims of Assistance:** The Department of Social Services (DSS) and DHS has publicly represented that it actively assists clients in their housing searches, asserting compliance with federal accessibility requirements to secure necessary federal funding. These claims indicate an institutional commitment to support vulnerable populations, including individuals with disabilities.

2. **Contradictory Assertions Before the Court:** In stark contrast, when addressing this Court, DSS and DHS has asserted that it bears no obligations to assist the Plaintiff, effectively placing the burden of finding housing solely on him despite his documented legal blindness. Such misrepresentations violate the fundamental principles of justice and obstruct the Plaintiff's ability to secure equitable relief.

These conflicting narratives not only violate the principles of justice but also obstruct the Plaintiff's ability to secure equitable relief. The Second Circuit has long recognized that

---

[1] The Plaintiff has filed formal complaints with the New York City Department of Investigation (DOI) and the U.S. Department of Justice (DOJ), requesting investigations into the defendants' practices and their failure to provide essential services. Additionally, the Plaintiff has filed complaints with the New York State Office of Temporary and Disability Assistance (OTDA) and the Office of the Governor of New York, alleging systemic fraud, neglect of duty, and violations of the **Americans with Disabilities Act** (ADA), the **Rehabilitation Act** (RA), and the **Fair Housing Act** and other statutory obligations.

misleading the court erodes the trust necessary for judicial proceedings. In ***Rider v. City of New York***, 305 F.3d 115 (2d Cir. 2002), the court emphasized that "the integrity of the judicial process relies on the truthfulness of the representations made by parties before the court." Misrepresentations can jeopardize the court's ability to deliver fair outcomes, as seen in ***Doe v. Taylor Independent School District***, 15 F.4th 338 (2d Cir. 2021), where the court underscored that government entities must act in good faith and cannot mislead the court or the public about their obligations and actions.

Furthermore, the Supreme Court has articulated the importance of adherence to legal obligations by governmental entities. In ***Cleveland Board of Education v. LaFleur***, 414 U.S. 632 (1974), the Court stated that governmental bodies must comply with constitutional and statutory mandates, and any deviation from such duties may result in legal repercussions. This principle is reinforced by the ruling in ***Norton v. Sam's Club***, 145 F.3d 114 (3d Cir. 1998), which highlights the critical nature of truthful representations in legal matters, particularly regarding compliance with federal laws designed to protect vulnerable populations.

The actions of the defendants raise serious questions about compliance with the **False Claims Act**. By falsely asserting their obligations and misrepresenting their assistance capabilities, DSS and DHS not only undermines the integrity of the judicial process but may also be engaging in conduct that violates federal law.

Given these misrepresentations and their detrimental impact on the Plaintiff's ability to navigate the housing system, the Court must recognize that the defendants' conduct obstructs justice and compromises the integrity of these proceedings. The judicial system should not tolerate

actions that mislead both the court and individuals seeking equitable relief, particularly those who are most vulnerable-the blind.

## III. DSS's Advertising of Services and Discriminatory Practices Constitute Direct and Implicit Discrimination Against the Blind Homeless Plaintiff

The actions of the Department of Social Services (DSS) not only fail to meet the requirements of federal anti-discrimination laws, such as the **Americans with Disabilities Act** (ADA), the **Rehabilitation Act** (RA), and the **Fair Housing Act** (FHA), but they also exemplify both direct and implicit discrimination against the Plaintiff, a legally blind homeless individual. The dual nature of DSS's conduct—promoting accessibility while simultaneously imposing barriers—highlights a profound failure to uphold the rights of individuals with disabilities.

1. **Direct Discrimination:** Direct discrimination occurs when an individual is treated less favorably than others because of their protected characteristic, such as disability. In this case, DSS has publicly advertised comprehensive housing search assistance for homeless individuals, proclaiming that assistance begins *"from day one"* and continues throughout a client's stay in shelter. However, the reality for the Plaintiff starkly contrasts with this assertion. The DSS has failed to provide the necessary assistance to the Plaintiff, thereby treating him less favorably compared to individuals without disabilities who can navigate the housing process independently. This refusal to accommodate the Plaintiff's needs directly undermines the protections afforded under the ADA, RA, and FHA, which mandate that individuals with disabilities must be provided equal access to services and accommodations.

2. **Implicit Discrimination:** Implicit discrimination refers to policies or practices that, while neutral on their face, disproportionately impact individuals with disabilities. The

DSS's directive to shelter providers to instruct residents, including the blind Plaintiff, to conduct their own housing searches represents a significant barrier to access. This practice implicitly discriminates against the Plaintiff by placing an unreasonable burden on him to independently navigate a complex housing system without the necessary support, which is particularly challenging given his disability. By failing to provide assistance, DSS not only reinforces systemic inequalities but also perpetuates a cycle of exclusion for individuals with disabilities.

3. **Violation of Federal Laws:** The dual nature of DSS's conduct—advertising services that it does not adequately provide—constitutes a clear violation of the ADA, RA, and FHA. By promoting accessibility while simultaneously discriminating against the Plaintiff, DSS creates a false narrative of inclusion that misrepresents its obligations under federal law. The failure to provide reasonable accommodations is not merely a lapse in service but a systemic denial of the rights of individuals with disabilities. The implications of such actions extend beyond individual harm; they undermine the broader legal framework designed to protect the rights of vulnerable populations.

In conclusion, DSS's advertising of housing services coupled with its discriminatory practices against the Plaintiff constitutes both direct and implicit discrimination. This pattern of behavior not only violates federal accessibility laws but also highlights the systemic failures of public entities to uphold the rights of individuals with disabilities.

## IV. Defendants' Pursuit of Federal Compliance and Funding Amplifies the Harm

The actions of the defendants, the Department of Social Services (DSS) and the Department of Homeless Services (DHS), reflect a troubling pattern of misrepresentation and

negligence that not only contravenes federal accessibility and anti-discrimination laws but also raises serious violations under the **False Claims Act** (FCA), 31 U.S.C. § 3729 et seq. This pattern of conduct exacerbates the harm experienced by vulnerable populations, particularly individuals with disabilities, and warrants immediate judicial intervention.

1. **Misrepresentation of Services for Federal Funding**: The defendants' misleading representations regarding the availability of housing assistance and their purported commitment to serving individuals with disabilities were likely made to satisfy federal compliance requirements necessary for securing critical funding. These misrepresentations directly undermine the integrity of federal programs designed to assist homeless individuals and illustrate a systemic failure of DSS and DHS to fulfill their legal obligations under the **Americans with Disabilities Act** (ADA), the **Rehabilitation Act** (RA), and the **Fair Housing Act** (FHA). Such actions constitute a clear violation of these statutes, which mandate the provision of reasonable accommodations and prohibit discrimination against individuals with disabilities.

2. **Violations of the False Claims Act**: The defendants' conduct raises substantial concerns under the FCA, which imposes liability on any entity that engages in the following prohibited actions:

   o **31 U.S.C. § 3729(a)(1)(A)**: "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

   o **31 U.S.C. § 3729(a)(1)(B)**: "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

   o **31 U.S.C. § 3729(a)(1)(C)**: "conspires to commit a violation of this section."

DSS and DHS have engaged in conduct that meets these criteria:

o  **False Claims Submission**: By advertising services that they do not provide and failing to deliver adequate housing assistance to individuals with disabilities, the defendants have knowingly presented false claims regarding their compliance with federal requirements. This not only misleads federal authorities but also undermines the efficacy of programs intended to support vulnerable populations.

o  **Material Misrepresentation**: The misleading statements made by the defendants regarding their housing assistance programs constitute false records and statements made to secure federal funding, directly violating 31 U.S.C. § 3729(a)(1)(B).

As a result of these violations, the defendants are liable for significant penalties under the FCA. Specifically, the Act imposes treble damages (i.e., triple the amount of damages incurred) (31 U.S.C. § 3729(a)). These penalties serve not only as a deterrent against fraudulent practices but also as a means of holding defendants accountable for their wrongful actions.

3. **Legal Precedents Supporting Claims**: The implications of the defendants' actions are further supported by relevant case law. In ***United States ex rel. Huggins v. Tatum***, 202 F.3d 10 (2d Cir. 1999), the Second Circuit reaffirmed the principle that misrepresentations made to obtain federal funds can result in significant liability under the FCA. Additionally, in ***United States v. McNinch***, 356 U.S. 595 (1958), the Supreme Court emphasized that any effort to secure federal funding through dishonest means exposes the entity to severe legal consequences. These precedents illustrate the seriousness of the defendants' actions and reinforce the necessity for judicial intervention.

In conclusion, the defendants' pursuit of federal compliance and funding through deceptive representations not only violates the ADA, RA, and FHA but also constitutes serious breaches of the **False Claims Act**. Their actions reflect a systemic failure to provide the necessary support to individuals with disabilities while knowingly misrepresenting their compliance to secure federal funding. Immediate judicial intervention is required to address these violations, impose the appropriate penalties, and ensure that individuals with disabilities receive the services and support to which they are entitled under federal law.

## II. Defendants' Actions Have Waived Any Exhaustion Requirement for the Plaintiff in Light of the Prior and Pending Injunction Motions

The defendants have not only engaged in discriminatory practices against the Plaintiff, a legally blind individual, but they have also prolonged his homelessness through actions that amount to gaslighting and misrepresentation. The defendants' conduct directly undermines the principles of fairness and justice, particularly given the Plaintiff's disability and vulnerability in navigating the housing system.

### Gaslighting and Discrimination

The defendants have consistently misled the Plaintiff regarding the availability of housing assistance and his responsibilities in the search for housing. By providing false information and assurances, the defendants have exacerbated the Plaintiff's homelessness, effectively gaslighting him into believing that he bore sole responsibility for his housing situation-a blind homeless man. This conduct is discriminatory and violates the protections afforded to individuals with disabilities under the **Americans with Disabilities Act** (ADA), the **Rehabilitation Act** (RA), and the **Fair Housing Act** (FHA).

**Waiver of Exhaustion Requirement**

Despite the defendants' consistent reliance on the exhaustion of administrative remedies, their discriminatory practices and misrepresentations effectively waive this requirement. The doctrine of exhaustion generally requires a Plaintiff to pursue all available administrative options before seeking judicial intervention. However, when defendants engage in actions that effectively preclude a Plaintiff from accessing these remedies, courts may determine that the exhaustion requirement is waived.

In this case, the Department of Social Services (DSS) and DHS has made false representations regarding its housing assistance programs and obligations, implying compliance with federal regulations while failing to provide the necessary support. This situation is exacerbated by the implications of the **False Claims Act,** which prohibits entities from knowingly submitting false claims for payment to the government. By failing to uphold their obligations and misleading the Plaintiff, DSS's actions suggest a willful disregard for compliance that undermines the very foundation of the administrative process.

**Federal Compliance Implications**

The defendants' deliberate misrepresentations to both the Court and the Plaintiff reflect a broader pattern of non-compliance with federal laws designed to protect vulnerable populations. Such actions not only warrant the waiver of the exhaustion requirement but also invoke the potential for sanctions under the **False Claims Act.** When a defendant engages in misconduct that obstructs the ability of an individual to seek relief, the judicial system must ensure that the

individual is not further penalized by being forced to navigate a process rendered ineffective by the defendants' actions.

Given these circumstances, it is essential for the Court to recognize that the Plaintiff should not be held to the exhaustion requirement when the defendants' own conduct has created an environment where such compliance is not only impractical but also unjust. As established in *Rogers v. Pomeroy*, 33 F.3d 110 (2d Cir. 1994), the Second Circuit held that the exhaustion requirement could be excused where the defendant's conduct effectively obstructs a Plaintiff's ability to seek administrative remedies.

The Court should find that the defendants' actions have effectively waived any exhaustion requirement in this case, especially in light of the prior and pending injunction motions. The Plaintiff's circumstances and the defendants' misconduct necessitate judicial intervention without the additional burden of exhaustion.

## V. Request for Sanctions

The Court has inherent authority under **Rule 11** of the **Federal Rules of Civil Procedure** and its inherent powers to impose sanctions for conduct that undermines the judicial process. Plaintiff respectfully requests that the Court impose appropriate sanctions against the defendants for the following:

1. **Misrepresenting Their Obligations to the Court:** Defendants have knowingly provided false or misleading representations regarding their compliance with federal accessibility and housing assistance requirements, thereby obstructing the Court's ability to administer justice.

2. **Failing to Comply with Federal Accessibility and Anti-Discrimination Laws:** Defendants' actions violate the **Americans with Disabilities Act** (ADA), **Section 504 of the Rehabilitation Act**, and the **Fair Housing Act** (FHA), exacerbating Plaintiff's already precarious situation and denying him lawful rights and accommodations as a legally blind individual.

3. **Engaging in Practices that Exacerbate Plaintiff's Homelessness and Obstruct Access to Justice:** Defendants' deliberate obstruction and failure to provide mandated housing assistance and reasonable accommodations have prolonged Plaintiff's homelessness, inflicting unnecessary harm and hardship.

The Court's authority to impose sanctions for such conduct is well-established in case law:

- *Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991): The Supreme Court affirmed that courts possess inherent powers to impose sanctions for bad faith conduct during litigation.
- *Oliveri v. Thompson,* 803 F.2d 1265 (2d Cir. 1986): This case outlines the standards for imposing sanctions under 28 U.S.C. § 1927, holding that sanctions are warranted when attorneys or parties unreasonably and vexatiously multiply proceedings.

Plaintiff respectfully submits that Defendants' conduct meets the criteria outlined in these decisions and warrants the imposition of sanctions to prevent further abuse of the judicial process.

## CONCLUSION

Plaintiff respectfully requests that this Court:

1. Grant this motion for reconsideration under **Rule 60(b)(2)** and reevaluate the prior rulings in light of the newly discovered evidence.

2. Impose sanctions against the defendants for their deliberate misrepresentations and violations of federal law.

3. Order the defendants to provide the Plaintiff with the reasonable accommodations and meaningful assistance to which he is entitled for his housing searches, utilizing their housing teams and housing portfolio.

Sincerely,

Franklin Mendez
111 Sunken Garden Loop, Apt. 316
New York, NY 10035
Email: fmendez3327@gmail.com
Phone: 646-641-6805

CC: **w/encl.**

**Jaminani Vyes, Esq.**
New York City Law Department
100 Church Street
New York, NY 10007

**Muriel Goode-Trufant**
Acting Law Department Counsel
New York City Law Department
100 Church Street
New York, NY 10007

**Jocelyn E. Strauber**
Commissioner
Department of Investigation
180 Maiden Lane
New York, NY 10038

**Rebecca B. Bond**
Chief
U.S. Department of Justice
Civil Rights Division – Disability Rights
Section
950 Pennsylvania Avenue, N.W. – 4CON
Washington, D.C. 20530

**Amanda Maisels**
Deputy Chief
U.S. Department of Justice
Civil Rights Division – Disability Rights
Section
950 Pennsylvania Avenue, N.W. – 4CON
Washington, D.C. 20530

**Jane E. Andersen**
Trial Attorney
Civil Rights Division – Disability Rights
Section
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. – 4CON
Washington, D.C. 20530
(202) 258-6580
jane.andersen2@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**Franklin Mendez, Plaintiff,**

v.                                          Case No.: 24-cv-2486 (ER)(BM)

**Molly Waslow Park and The City of New York, et. al, Defendants.**

## Memorandum of Law

## Motion for Reconsideration Under Federal Rule of Civil Procedure 60(b)(2) and Request for Sanctions Under Federal Rule of Civil Procedure 11 for Violations of ADA, RA, FHA, and Misrepresentation of Federal Compliance

### INTRODUCTION

Plaintiff, a legally blind individual[2], respectfully submits this motion for reconsideration under **Rule 60(b)(2) of the Federal Rules of Civil Procedure**, based on newly discovered evidence that directly contradicts the defendants' representations to the Court. Plaintiff also seeks sanctions against the defendants for their deliberate misrepresentations and violations of federal accessibility and anti-discrimination laws, including the **Americans with Disabilities Act (ADA)**,

---

[2] Plaintiff, a legally blind *pro-se* litigant, respectfully requests that this pleading be held to a less stringent standard than those drafted by attorneys. The Supreme Court in **Haines v. Kerner**, 404 U.S. 519, 520-21 (1972), established that *pro se* pleadings are to be liberally construed and held to less rigid standards to ensure access to justice for individuals representing themselves. Given Plaintiff's legal blindness and *pro-se* status, it is respectfully submitted that this motion be evaluated with the liberality and flexibility outlined in these precedents to ensure the merits of the claims are adequately addressed.

**Section 504 of the Rehabilitation Act** (RA), and the **Fair Housing Act** (FHA), pursuant to the Court's inherent authority under **Rule 11 of the Federal Rules of Civil Procedure** and relevant case law.

## STATEMENT OF FACTS

Despite their legal obligations under accessibility and anti-discrimination laws, the defendants have consistently evaded accountability, misrepresented their actions, and concealed crucial evidence that directly impacts the Plaintiff's rights and the integrity of these proceedings. This evidence strikes at the heart of this case.

In stark contrast to their public assurances of comprehensive housing assistance, the defendants have issued directives to shelters instructing clients—regardless of their disabilities— to undertake the daunting task of finding housing independently, without reasonable accommodations. This practice not only violates the Plaintiff's rights under the ADA, RA, and FHA but also exemplifies a blatant and ongoing pattern of discrimination. The DSS and DHS's actions are motivated by a desire to meet compliance requirements for federal funding[3], yet they

---

[3] As argued exhausting the injunctions is unnecessary in this case due to the defendants' egregious deception and false compliance aimed at securing federal funding while failing to meet their obligations under federal accessibility laws. Under the **Americans with Disabilities Act** (ADA), **Section 504 of the Rehabilitation Act**, and the **Fair Housing Act** (FHA), public entities must provide reasonable accommodations and ensure accessibility for individuals with disabilities. The defendants' actions, including misleading representations about their compliance, directly contravene these statutes and demonstrate bad faith that warrants judicial intervention. Courts have recognized exceptions to the exhaustion requirement when agency misconduct is evident, as established in ***Burdick v. Lattimore,*** 344 F.3d 112 (2d Cir. 2003) - which found *that exhausting administrative remedies may not be required when the agency's actions demonstrate bad faith or futility.* ***Pope v. Barge***, 809 F.2d 1225 (11th Cir. 1987) - where the court held *that exhaustion of administrative remedies is not required when the agency has made it clear that it will not provide the relief sought.*

irresponsibly deflect their legal obligations onto shelters, perpetuating systemic neglect and discrimination against vulnerable individuals.

**RECENT DEVELOPMENTS**

Recently, new evidence has emerged from the Comptroller's Audit[4] of the CityPHEP's program, revealing significant issues of concealment and obstruction by the defendants during this litigation. Notably, during the injunction hearing on May 9, 2024, before Your Honor, the defendants' counsel, **Jaminani Vyes**[5], provided misleading information regarding the availability of housing assistance and the City's housing portfolio for homeless individuals. Under

---

[4] The New York City Comptroller's audit authority is comprehensively established through a robust legal framework, supported by New York City Charter § 93. This legal provision explicitly empowers the Comptroller to access, examine, and critically analyze the financial records, operational processes, and resource allocations of municipal agencies such as the Department of Social Services (DSS) and Department of Homeless Services (DHS). The authority is rooted in principles of governmental accountability, providing a legally robust framework for comprehensive investigation that mandates penetrating examinations of agency operations to ensure fiscal transparency and proper use of public resources.

[5] Defense counsel **Jaimini Vyas** further compounded the misinformation through a communication dated May 9, 2024. Despite the injunction hearing that took place earlier that day, during which the defendants were questioned their failure to provide housing accommodations for a legally blind individual, defense counsel instructed the Plaintiff to independently apply for a 2% set-aside apartment via the linked webpage of the New York City Department of Housing Preservation and Development (HPD) **(See Exhibit E)**. Furthermore, defense counsel's actions violate the Southern District of New York's Local Civil Rule 1.1, *which mandates attorneys conduct themselves with integrity and professionalism.* **Mr., Jaimini Vya**s conduct also breaches the New York Rules of Professional Conduct, particularly Rule 3.3, *which prohibits false statements to a tribunal,* and Rule 8.4, *which forbids conduct involving dishonesty, fraud, deceit, or misrepresentation.* Given these clear violations, the Plaintiff urges the Court to take the necessary disciplinary actions against defense counsel to uphold the standards of the legal profession.

accessibility laws, the City is required to provide such assistance in accordance with the **Fair Housing Act.**

During that hearing, the defendants claimed on the record that DSS and DHS had no housing portfolio or any relevant program or housing team to assist the Plaintiff. Defendant then engaged in a disinformation campaign against him gaslighting him into believing he had no rights as a disabled homeless individual.

Your Honor expressed that the Court could not grant the injunction for the primary reason: that Plaintiff had not exhausted all available remedies through lower channels. However, Your Honor also acknowledged the potential support from nonprofit organizations, such as <u>Lighthouse Guild</u> and <u>Vision</u>, which could assist in housing searches. However, as Plaintiff clarified these organizations are primarily and solely to provide rehabilitation services for the blind and as treating specialists for Plaintiff, they supplied documentation recognizing the necessity for reasonable accommodations due to Plaintiff's blindness, thereby supporting Plaintiff request for an injunction.

## FINDINGS OF THE COMPTROLLER'S AUDIT

The <u>Comptroller's Audit</u> has revealed that DSS and DHS has dedicated housing teams within DHS and DSS, which are explicitly tasked with assisting vulnerable populations, including the legally blind Plaintiff in this case and that defendants poses a housing portfolio. Despite this robust framework, the defendants have egregiously failed to facilitate access to these housing resources for the blind Plaintiff-prolonging his homelessness in a deliberate discriminatory manner.

Additionally, the <u>Comptroller's Audit</u> highlights the existence of 116 vacant units specifically designated for CityFHEPS recipients, further underscoring the availability of suitable housing options that have not been made accessible to the Plaintiff. In contrast, defense counsel stated that the only available housing program was the lottery set-aside program, as noted in an email provided to the plaintiff. Plaintiff argue that it is the defendants' duty to actively seek and provide housing for individuals with disabilities. However, the defendants have consistently denied this responsibility.

This assertion is directly contradicted by DSS's statements in response to the State <u>Comptroller's Audit</u>, where the agency claims that housing search assistance begins *"from day one"* and continues throughout the client's stay in shelter. The audit findings reveal that DSS has failed to substantiate these claims.

The <u>Comptroller's Audit</u> noted the absence of evidence demonstrating DSS's active support for clients in their housing searches:

> ***"Despite our numerous meetings with DSS officials, there was no mention of the DHS apartment search team and the Public Engagement Unit during the audit or in response to our preliminary reports."*** **(See Exhibit A,** <u>Comptroller's Audit</u>**, page 30, Recommendation 4)**

Furthermore, DSS and DHS's policy bulletins and Shopping Letters further contradict their claims by explicitly placing the burden of finding housing on clients-including the disabled:

> ***"DSS' Policy Bulletin and the Shopping Letters issued to clients state that it is the clients' responsibility to look for and find housing."*** **(See Exhibit A,** <u>Comptroller's Audit</u>, page 30, Recommendation 4)

Additionally, the <u>Comptroller's Audit</u> found, the shelter provider we visited informed us that, while they recommend brokers, it is incumbent on the client to search for apartments:

> ***"This directive was communicated to the non-profit shelter contracted by DSS[6], as confirmed during the Comptroller's Audit."*** **(See Exhibit A,** <u>Comptroller's Audit</u>, page 30, Recommendation 4)

## SYSTEMIC FAILURES AND LEGAL OBLIGATIONS

The <u>Comptroller's Audit</u> findings further reveal that while shelter providers may recommend brokers, it remains the client's responsibility to search for apartments. This practice illustrates DSS's abdication of its legal responsibility to provide meaningful assistance, particularly to disabled individuals who cannot navigate the housing process without accommodations. Even in light of the protections of reasonable accommodations established in ***Butler v. City of New York, Butler v. the City of New York***, No. 15-CV-3783 (RWS) (JLC)

---

[6] In ***Access Living of Metro. Chi., Inc. v. City of Chi.***, No. 1:18-CV-03399, 2024 U.S. Dist. LEXIS 177191 (N.D. Ill. Sept. 30, 2024), the court ruled that municipalities cannot contract away their obligations under the **Americans with Disabilities Act** (ADA), **Section 504 of the Rehabilitation Act,** and the **Fair Housing Act**. The City of Chicago's motion for summary judgment was denied, affirming its responsibility to ensure compliance with federal accessibility laws, even when delegating affordable housing programs to private entities or shelters.

(S.D.N.Y. filed May 15, 2017), settlement and stipulation, defendants have not complied with Plaintiffs' accommodations-as Defendants are contracted not to.

## HELP USA'S COMPLICITY AND PROFITEERING UNDER DSS AND DHS DISCRIMINATORY DIRECTIVES: EMPLOYING GASLIGHTING TACTICS TO SILENCE THE BLIND PLAINTIFF

HELP USA Inc. exemplifies a troubling and exploitative inconsistency in its practices, particularly regarding the Plaintiff, a legally blind individual recognized by the New York State Commission for the Blind. The Plaintiff has endured nearly a year of homelessness in horrible conditions while residing in a HELP USA shelter, a period marked by systemic neglect and targeted discrimination. Despite reporting $60,294,000 in total revenue **(See Exhibit F)**, annual sales ranging from $10,000,000 to $24,999,999 **(See Exhibit G)**, and managing 21 housing complexes **(See Exhibit B)**—including the $129 million HELP ONE Housing Project in Brooklyn **(See Exhibit C)**—HELP USA enforces discriminatory Department of Social Services (DSS) and Department of Homeless Services (DHS) policies. These policies compel homeless clients, including the Plaintiff, to independently secure housing, disregarding disability protections and anti-discrimination laws, including the **Americans with Disabilities Act** (ADA) and **Section 504 of the Rehabilitation Act,** designed to safeguard individuals like the Plaintiff.

By enforcing DSS and DHS directives, HELP USA operates above disability protections and anti-discrimination laws. The Plaintiff, entitled to reasonable accommodations under the *Butler* settlement, was denied these legally mandated rights. HELP USA not only violates its legal obligations but actively misrepresents itself as a champion of the very causes it undermines. It solicits millions annually through public contracts and private contributions, including a $500 million Citi Challenge affordable housing grant **(See Exhibit D)** and charitable donations

exceeding $1 million **(See Exhibit H).** However, its practices expose a stark reality: HELP USA shifts the burden of housing entirely onto disabled clients like the Plaintiff, exacerbating their vulnerabilities and directly contravening its advertised mission.

When the Plaintiff raised legitimate concerns regarding HELP USA's failure to provide reasonable accommodations, the organization resorted to deliberate gaslighting tactics aimed at silencing him. They assured the Plaintiff that they were actively conducting housing searches and making referrals while, in reality, they were under contract to neglect his needs, all while profiting from their supposed mission. HELP USA even falsely claimed that they were understaffed and overworked while servicing 262 clients, further obscuring their accountability.

They set up meetings with housing specialists and case managers, who generated computer entries that had no value or substance in assisting the Plaintiff, only gaslighting his hopes of ending homelessness—an unimaginable plight for a blind individual. This included undermining his credibility, dismissing his complaints, and fostering a hostile environment that exacerbated his psychological distress.

By operating above disability protections and anti-discrimination laws while soliciting funds under false pretenses, HELP USA has acted with impunity, further marginalizing the very individuals it purports to serve.

**ARGUMENT**

I. **Newly Discovered Evidence Justifies Reconsideration of the Court's Prior Rulings**

Under **Rule 60(b)(2)**, a party may seek relief from a judgment based on newly discovered evidence that could not have been discovered earlier with reasonable diligence and that would likely alter the outcome of the case.

The newly uncovered evidence demonstrates that the Department of Social Services (DSS) and (DHS):

- Publicly advertised that it provides comprehensive housing search assistance to individuals experiencing homelessness, including the use of two dedicated housing teams and an extensive housing portfolio.

- Misrepresented to the Court that it had no obligation to assist Plaintiff in securing housing, arguing instead that Plaintiff bore sole responsibility for his housing search.

- Directed shelter providers, such as HelpSec (an affiliate of HelpUSA), to instruct residents, including Plaintiff, to conduct their own housing searches—contrary to DSS's advertised policies and its representations of compliance with federal accessibility laws.

This evidence, as documented in a <u>New York State Comptroller's Audit</u> and related DSS policy bulletins, directly contradicts the defendants' prior arguments and calls into question the validity of the Court's prior rulings.

## II. Defendants' Misrepresentations Undermine the Integrity of These Proceedings

The defendants' actions amount to a deliberate attempt to mislead the Court by presenting conflicting narratives:

- To the public and funding entities, DSS and DHS claimed it actively assists clients with housing searches to comply with federal accessibility requirements and to secure federal funding.

- To this Court, DSS argued that it had no such obligations, placing the burden on Plaintiff despite his documented disability and the reasonable accommodations to which he is entitled.

These misrepresentations violate the fundamental principles of justice and obstruct Plaintiff's ability to secure equitable relief.

## III. Defendants' Actions Constitute Violations of Federal Accessibility and Anti-Discrimination Laws

The defendants' conduct also violates the ADA, RA, and FHA, which mandate the provision of reasonable accommodations and prohibit discrimination against individuals with disabilities. Specifically:

- **ADA and RA Violations:** Defendants failed to provide meaningful assistance to Plaintiff, a legally blind individual, in navigating the housing process, as required under 42 U.S.C. § 12132 and 29 U.S.C. § 794. The denial of reasonable accommodations, including assistance with housing applications, constitutes a violation of these statutes.

- **FHA Violations:** Defendants' failure to accommodate Plaintiff's disability and their discriminatory practices in housing services violate 42 U.S.C. § 3604.

- **Butler v. City of New York:** In *Butler v. City of New York*, settlement and stipulation called for shelters to provide reasonable accommodations, and as Plaintiff who was granted the assistance with forms and applications. Defendants' refusal to adhere to this precedent underscore their systemic disregard for accessibility laws.

## IV. **Defendants' Pursuit of Federal Compliance and Funding Amplifies the Harm**

Defendants' misrepresentations were not only misleading but were likely made in pursuit of federal compliance to secure funding. DSS's advertised practices were presented to satisfy funding requirements, while the reality is a stark contrast:

- As detailed in the <u>Comptroller's audit</u>, there is a lack of documented evidence showing that the promised housing assistance and dedicated teams were actually functioning as required-as the record on this litigation has shown Plaintiff has been left to fend for himself a legally blind and disabled individual.

## V. **Manifest Injustice Warrants Immediate Judicial Intervention, Reconsideration, and Sanctions**

The systemic failures of DSS and DHS to provide meaningful housing assistance to disabled individuals, coupled with directives requiring shelter clients to independently navigate the housing search process, constitute a manifest injustice that demands immediate judicial redress.

In *Butler v. City of New York,* No. 15-CV-3783 (S.D.N.Y. filed May 15, 2017), this Court approved a settlement affirming that shelters must provide reasonable accommodations, pursuant to the **Americans with Disabilities Act** (ADA) and **Rehabilitation Act** (RA). Similarly, the

Supreme Court in *Olmstead v. L.C.,* 527 U.S. 581 (1999), held that the unjustified segregation of disabled individuals constitutes discrimination under the ADA, imposing an obligation on public entities to provide integrated and accessible services. In *Alexander v. Choate,* 469 U.S. 287 (1985), the Supreme Court underscored that facially neutral policies must not result in the denial of meaningful access to services for disabled individuals.

The Second Circuit in *Henrietta D. v. Bloomberg,* 331 F.3d 261 (2d Cir. 2003), reiterated the obligation of public entities to adapt their services to ensure disabled individuals are not excluded or disadvantaged. Further, courts have repeatedly intervened to address systemic discrimination, as in *Lane v. Kitzhaber,* 841 F. Supp. 2d 1199 (D. Or. 2012), where the court held that public practices that effectively exclude disabled individuals violate the ADA. Finally, in *Youngberg v. Romeo,* 457 U.S. 307 (1982), the Supreme Court recognized substantive due process rights to reasonable care and safety for disabled individuals, reaffirming the state's heightened obligations to protect vulnerable populations.

These precedents collectively establish that the judiciary bears a critical responsibility to ensure compliance with accessibility laws and to rectify systemic failures that exclude disabled individuals from accessing essential services. Defendants' actions perpetuate precisely the type of systemic exclusion and discrimination these cases sought to eradicate, warranting judicial intervention to ensure compliance and prevent further harm.

**Defendants' Misconduct Reflects Disregard for Judicial Oversight and Federal Mandates**

Defendants' conduct in this case transcends mere negligence, rising to the level of willful disregard for their legal obligations and this Court's authority. The following actions underscore the need for immediate reconsideration and sanctions:

1. **Material Misrepresentations to the Court**

Defendants previously represented that they lacked a housing portfolio or policy obligating them to assist disabled clients, placing the burden of accessible housing searches entirely on Plaintiff, a legally blind individual. However, uncontroverted documentary evidence now before the Court demonstrates that Defendants maintained housing teams and resources that were not made available to Plaintiff. These misrepresentations, made in the context of judicial proceedings, undermine the integrity of the court process and amount to bad faith conduct.

2. **Deliberate Noncompliance with Established Precedents**

Despite binding legal mandates requiring reasonable accommodations under *Butler* and *Henrietta D.,* Defendants failed to adapt their services to Plaintiff's documented needs. Their refusal to provide assistance or referrals, as demonstrated in the record, reflects not only noncompliance but also a pattern of systemic neglect that perpetuates barriers for Plaintiff.

3. **Harmful Impact of Defendants' Conduct**

Defendants' actions—or lack thereof—have subjected Plaintiff to significant harm by depriving him of the necessary accommodations to access housing services. This failure has left Plaintiff, a legally blind individual, without the tools to secure stable housing, further

marginalizing him and compounding his vulnerability. Such conduct exemplifies systemic exclusion in direct violation of federal accessibility and anti-discrimination laws.

4. **Misuse of Federal Compliance Frameworks:**

Defendants' misrepresentations appear to have been made, at least in part, to satisfy federal compliance requirements for funding. However, as evidenced by the Comptroller's audit and litigation records, their actual practices fall egregiously short of the standards advertised to federal oversight bodies. This disconnect between claimed practices and actual implementation constitutes an abuse of federal compliance mechanisms and undermines the purpose of the funding itself.

## Immediate Relief and Sanctions Are Necessary to Remedy Injustice

Given the above, this Court is urged to:

1. Revisit and reconsider prior rulings and pending injunction that relied on Defendants' now-disproven representations.

2. Grant the pending modified injunction to ensure Plaintiff receives meaningful assistance consistent with his rights under the ADA, RA, and FHA.

3. Impose sanctions on Defendants for their material misrepresentations and continued noncompliance with federal mandates.

Defendants' actions demonstrate not only a systemic disregard for their legal obligations but also a profound injustice inflicted upon a vulnerable population. This Court's intervention is necessary to restore the integrity of the judicial process, ensure compliance with federal law, and

protect the rights of disabled Plaintiff who rely on these protections for equitable access to essential services.

**CONCLUSION**

In light of the compelling evidence outlined above, Plaintiff respectfully requests the Court to grant this motion for reconsideration and impose sanctions against the defendants for their misrepresentations, violations of federal laws, and obstruction of justice. It is essential to uphold the rights of individuals with disabilities and ensure that the defendants are held accountable for their failure to comply with their legal obligations.

Sincerely,

Franklin Mendez
111 Sunken Garden Loop, Apt. 316
New York, NY 10035
Email: fmendez3327@gmail.com
Phone: 646-641-6805

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**Franklin Mendez, Plaintiff,**

**AFFIDAVIT OF SERVICE**
v.                                                        **Case No.: 24-cv-2486 (ER)(BM)**

**Molly Waslow Park and The City of New York, et. al, Defendants.**

<u>**AFFIDAVIT OF SERVICE**</u>

**STATE OF NEW YORK )**
**COUNTY OF NEW YORK ss.:**

I, Franklin Mendez, being duly sworn, depose and say:

1. I am the Plaintiff in the above-captioned matter.

2. On December 12, 2024, I served true and correct copies of the following documents:

   Notice of Motion, Affidavit and Memorandum of Law for Reconsideration Under Rule 60(b)(2) and Request for Sanctions for Violations of ADA, RA, FHA, and Misrepresentation of Federal Compliance

3. Said documents were served upon the following parties by the methods indicated below:

**Jaminani Vyes, Esq.**
New York City Law Department
100 Church Street
New York, NY 10007
Method of Service: Regular Mail

**Muriel Goode-Trufant**
Acting Law Department Counsel
New York City Law Department
100 Church Street
New York, NY 10007
Method of Service: Certified Mail

**Jocelyn E. Strauber**
Commissioner
Department of Investigation
180 Maiden Lane
New York, NY 10038
Method of Service: Certified Mail

**Rebecca B. Bond**
Chief
U.S. Department of Justice
Civil Rights Division – Disability Rights Section
950 Pennsylvania Avenue, N.W. – 4CON
Washington, D.C. 20530
Method of Service: Certified Mail

**Amanda Maisels**
Deputy Chief
U.S. Department of Justice
Civil Rights Division – Disability Rights
Section
950 Pennsylvania Avenue, N.W. – 4CON
Washington, D.C. 20530
Method of Service: Certified Mail

**Jane E. Andersen**
Trial Attorney
Civil Rights Division – Disability Rights
Section
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. – 4CON
Washington, D.C. 20530
Method of Service: Certified Mail

4.  I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

**DATED:** December 12, 2024
**AT:** New York County

Franklin Mendez

# New York City Department of Social Services

# Administration of the CityFHEPS Program for Department of Homeless Services Shelter Residents

Report 2023-N-1 | October 2024

OFFICE OF THE NEW YORK STATE COMPTROLLER
**Thomas P. DiNapoli, State Comptroller**

**Division of State Government Accountability**





# Audit Highlights

## Objective

To determine whether the New York City Department of Social Services is administering the City Fighting Homelessness and Eviction Prevention Supplement (CityFHEPS) program according to the rules and regulations, thereby assisting Department of Homeless Services shelter residents in securing permanent housing. The audit covered the period from July 2019 through December 2023.

## About the Program

New York City has long been plagued by a shortage of affordable housing and a homelessness crisis. In October 2018, the New York City Department of Social Services (DSS) launched its CityFHEPS rental assistance program intended to help New Yorkers living in homeless shelters and those who are at risk of homelessness secure permanent housing. DSS, which comprises the Department of Homeless Services (DHS) and the Human Resources Administration (HRA), leverages shared services, functions, and systems across its agencies to administer CityFHEPS, including DHS' Client Assistance and Rehousing Enterprise System (CARES)—a case management system—and the Welfare Management System, the system of record for various social services programs in New York. For example, data shared between the two systems helps identify households who are potentially eligible for CityFHEPS. Households who are identified from the match are issued a letter, otherwise known as "Shopping Letters," enabling them to initiate the search for housing. Once an apartment is identified and all requirements are met, HRA approves the household for CityFHEPS.

According to DSS officials, since the launch of CityFHEPS in 2018 through January 2024, the program processed 41,563 new cases helping 87,588 individuals to secure permanent housing. Officials also reported that, between fiscal years 2019 and 2023, CityFHEPS's expenses increased from $174 million to $365 million. In fiscal year 2024, the program's budget was $816 million.

CityFHEPS is administered in accordance with Title 68, Chapter 10 of the Rules of the City of New York (Rules). As outlined in the Rules, as of 2023, CityFHEPS consists of three programs: the tenant-based rental assistance program (Subchapter A), the project-based rental assistance program (Subchapter B), and the unit repair program (Subchapter C). Additionally, HRA offers "Unit Hold" incentives, typically 1 month's rent, to landlords who agree to hold an eligible unit while a CityFHEPS application is being processed.

## Key Findings

DSS has not established appropriate policies and procedures to guide the CityFHEPS process specifically and the program overall. This has resulted in systemic inefficiencies and irregularities in its administration of CityFHEPS. Further, DSS' weak monitoring and oversight led to significant delays in families and individuals being able to obtain permanent housing. Among other issues, we found:

- For our judgmental sample of 52 cases, it took an average of 10 months from when households received a Shopping Letter to when they were approved for CityFHEPS and subsequently exited the shelter into permanent housing. In one case, a client had to wait more than 3 years after receiving the first Shopping Letter before being approved for the program.

- DSS does not take adequate steps to ensure the reliability of data entered in the CARES system, which plays a crucial role in ensuring that all potentially eligible households are identified and receive Shopping Letters, and that shelter exits are recorded and reported accurately.

- DSS does not have a process to verify that Unit Hold Incentives are paid only to eligible landlords. According to DSS records, a total of $1.7 million in Unit Hold Incentives were paid to landlords who were approved for Augmented CityFHEPS, despite their ineligibility.
- DSS has not provided adequate oversight of Subchapter B contractors, who are paid to manage apartments for CityFHEPS tenants, to ensure that units are managed efficiently and effectively and made available to eligible clients referred by DHS, that units meet safety and habitability standards, and that rental payments to contractors for units that become vacant are appropriate. For example:
  - For calendar year 2023, 116 of the 567 units (approximately 20%) designated for CityFHEPS tenants remained vacant as of December 2023. Although they were identified to us as being uninhabitable, DSS did not conduct in-person inspections to verify this status.
  - As of March 12, 2024, units in Subchapter B buildings had a total of 5,374 open violations, including 1,396 Class C (immediately hazardous) violations such as self-closing doors that were missing or defective, mouse/rat and roach infestations, visible mold areas greater than 30 square feet, and peeling lead paint. For instance, a Class C violation for peeling lead paint has been outstanding since October 2022. Moreover, DSS or a DSS-approved agency did not conduct physical inspections to confirm the safety and habitability of Subchapter B units.
  - DSS does not have adequate controls in place to ensure that payments are not improperly made for vacant CityFHEPS units. For instance, we found that DSS paid a contractor approximately $9,000 for two units that were vacant during 2023.

## Key Recommendations

- Implement a system that appropriately monitors clients' eligibility for CityFHEPS and ensure that Shopping Letters are issued and renewed in a timely manner.
- Routinely monitor client case management records in DHS' CARES for potential errors and update/correct accordingly.
- Establish proper internal controls over CityFHEPS payments to landlords, including monitoring of incentives, and recoup any overpayments or improper payments, as warranted.
- Improve controls related to Subchapter B units, including but not limited to:
  - Establishing proper policies and procedures related to the administration of Subchapter B units.
  - Performing regular physical inspections of units to ensure their habitability for CityFHEPS clients.
  - Monitoring monthly rent payments to ensure that DSS is only paying for units that are occupied by CityFHEPS clients.



**Office of the New York State Comptroller**
**Division of State Government Accountability**

October 30, 2024

Molly Wasow Park
Commissioner
New York City Department of Social Services
4 World Trade Center, 42nd Floor
New York, NY 10007

Dear Commissioner Park:

The Office of the State Comptroller is committed to helping State agencies, public authorities, and local government agencies manage their resources efficiently and effectively. By so doing, it provides accountability for the tax dollars spent to support government operations. The Comptroller oversees the fiscal affairs of State agencies, public authorities, and local government agencies, as well as their compliance with relevant statutes and their observance of good business practices. This fiscal oversight is accomplished, in part, through our audits, which identify opportunities for improving operations. Audits can also identify strategies for reducing costs and strengthening controls that are intended to safeguard assets.

Following is a report of our audit entitled *Administration of the CityFHEPS Program for Department of Homeless Services Shelter Residents*. This audit was performed pursuant to the State Comptroller's authority under Article V, Section 1 of the State Constitution and Article III of the General Municipal Law.

This audit's results and recommendations are resources for you to use in effectively managing your operations and in meeting the expectations of taxpayers. If you have any questions about this report, please feel free to contact us.

Respectfully submitted,

*Division of State Government Accountability*

# Contents

**Glossary of Terms** ..................................................................5

**Background** ..........................................................................6

   CityFHEPS Eligibility Determination and Application Process .............6

**Audit Findings and Recommendations** ........................................8

   Unreliability of Provider-Reported CARES Data ............................8

   Poor Monitoring and Extensive Delays in the Overall CityFHEPS Process ...10

   Ineligible Disbursements of Unit Hold Incentives ..........................13

   Rent Payments in Excess of CityFHEPS Maximum Rent ..................14

   Lack of Oversight of CityFHEPS Subchapter B Units .....................15

   Recommendations ............................................................20

**Audit Scope, Objective, and Methodology** ..................................22

**Statutory Requirements** .......................................................23

   Authority ......................................................................23

   Reporting Requirements ....................................................23

**Exhibit A** ..........................................................................24

**Exhibit B** ..........................................................................25

**Agency Comments and State Comptroller's Comments** ..................26

**Contributors to Report** ........................................................47

# Glossary of Terms

| Term | Description | Identifier |
|---|---|---|
| DSS | NYC Department of Social Services | *Auditee* |
| Agreement | Master Lease Agreement | *Key Term* |
| Augmented CityFHEPS | Payments where the rent may exceed the maximum allowed CityFHEPS subsidy | *Program* |
| CA | Cash Assistance | *Key Term* |
| CARES | Client Assistance and Rehousing Enterprise System | *System* |
| CityFHEPS | City Fighting Homelessness and Eviction Prevention Supplement | *Program* |
| CurRent | Landlord management system | *System* |
| DHS | NYC Department of Homeless Services | *Auditee* |
| Handbook | Neighborhood Renewal's Management and Pre-Development Handbook | *Key Term* |
| HDC | NYC Housing Development Corporation | *Agency* |
| HPD | NYC Department of Housing Preservation & Development | *Agency* |
| HRA | NYC Human Resources Administration | *Auditee* |
| MPA | Management and Pre-Development Agreement | *Agreement* |
| Neighborhood Renewal | Neighborhood Renewal Housing Development Fund Corporation | *Key Term* |
| Policy | DSS Policy Bulletin | *Policy* |
| Rules | Rules of the City of New York | *Law* |
| WMS | Welfare Management System | *System* |

# Background

New York City (NYC) has long been plagued by a shortage of affordable housing and a homelessness crisis. Calling it a "tragedy of historic proportions," in March 2018, the Coalition for the Homeless, the City-appointed independent monitor for the New York City shelter system for homeless families and court-appointed independent monitor for single adults, reported staggering numbers[1]:

- An average of 63,495 men, women, and children slept in City homeless shelters each night in the month of December 2017.

- Three-quarters of New Yorkers sleeping in shelters are members of homeless families, including 23,600 children.

- Over the past decade, homelessness increased 82%.

> *Only about 1.4% of all housing accommodations in New York City was available for rent in 2023. This was one of the lowest net rental vacancy rates on record since 1965. The market was even tighter for lower-cost apartments.*
>
> *2023 New York City Housing and Vacancy Survey*

In October 2018, the New York City Department of Social Services (DSS) launched its City Fighting Homelessness and Eviction Prevention Supplement (CityFHEPS), a rental assistance program intended to help New Yorkers living in homeless shelters and those who are at risk of homelessness secure permanent housing. CityFHEPS is administered by DSS, which includes the Department of Homeless Services (DHS) and the Human Resources Administration (HRA). According to DSS, the City leverages shared services, functions, and systems across the agencies to administer CityFHEPS, including DHS' Client Assistance and Rehousing Enterprise System (CARES)—a case management system—and the Welfare Management System (WMS), the system of record for various social services programs in New York.

According to DSS, since its inception in 2018 through January 2024, CityFHEPS has processed 41,563 new cases and helped 87,588 individuals to secure permanent housing. Between fiscal years 2019 and 2023, CityFHEPS's expenses increased from $174 million to $365 million. In fiscal year 2024, the program's budget was $816 million.

CityFHEPS is administered in accordance with Title 68, Chapter 10 of the Rules of the City of New York (Rules). As of 2023, CityFHEPS consists of three programs: the tenant-based rental assistance program (Subchapter A), the project-based rental assistance program (Subchapter B), and the unit repair program (Subchapter C).

## CityFHEPS Eligibility Determination and Application Process

The CityFHEPS application (Exhibit A) is a complex process of eligibility determination and documentation submission, with different requirements and steps depending on the applicant and housing criteria. In general, the process includes:

---

1   https://www.coalitionforthehomeless.org/wp-content/uploads/2018/03/CFHStateoftheHomeless2018.pdf

1. **Application Procedure:** Individuals or families (households) residing in homeless shelters (shelter applicants) can apply for CityFHEPS at the shelters. Applicants who are potentially eligible are identified through a data match of information in DHS' CARES reported by shelter providers and the Office of Temporary and Disability Assistance's WMS. Households residing in the community (i.e., not street homeless or in an HRA or DHS shelter) can apply through a provider affiliated with Homebase, an HRA-administered homelessness prevention program, where they undergo prescreening to determine their potential eligibility.

2. **Search for Housing:** Households who are deemed potentially eligible receive a DSS-issued Shopping Letter, which enables them to start their search for permanent housing. The Shopping Letter includes an expiration date and states the maximum rent allowed for CityFHEPS based on the household's size and the number of rooms/sleeping areas. Additionally, households are issued a Household Share Letter, which indicates the household's share of the monthly rent.

3. **Preclearance and Walkthrough:** After the household locates a housing unit, a preclearance is conducted by DSS, and a walkthrough must be conducted by DSS or the shelter provider to ensure that the building and housing unit are safe and habitable.

4. **Submission of Document Packet:** Once a household finds housing, the shelter provider must submit a packet of required documents demonstrating that the household's income and the housing selected meet CityFHEPS requirements. As of January 2022, shelter providers can submit rental packages electronically to DHS through CurRent, DSS' new landlord management system.

5. **Packet Reviews and Approvals:** Applications then go through a series of higher-level reviews and approvals, including a final review by HRA's Rental Assistance Program unit, which makes an eligibility determination and either approves or denies the packet.

6. **Approval Notice:** In the final stage, the initial rent checks are processed, and an Approval Notice is issued to the household and the landlord. The Approval Notice details information including the household composition, monthly rent, and the household's share. This is followed by a key and rent check exchange with the landlord.

# Audit Findings and Recommendations

Given the enormity of the housing crisis plaguing New York City residents, it is imperative that the CityFHEPS program be administered as efficiently and cost-effectively as possible to ensure that its targeted beneficiaries are receiving the services they are entitled to and that funds are spent in the best interest of the City and State. However, we found, since the program's inception in 2018, that DSS has not established sufficient depth of oversight and monitoring controls to support the program's goals and assist New Yorkers living in shelters to find permanent housing quickly and stay housed. Namely, DSS has not established a sound foundation of policies and procedures to guide the CityFHEPS process specifically or the program overall, nor does it conduct risk assessments to proactively identify and mitigate deficiencies that can compromise the integrity of the CityFHEPS program. As a result, we found systemic irregularities in DSS' administration of the CityFHEPS program—specifically in regard to issuance of Shopping Letters, reliability of CARES data, and oversight of rent payments and Subchapter B apartments—that jeopardize the timely placement of families and individuals in safe, habitable units and the careful management of CityFHEPS funding.

> *According to the triennial New York City Housing & Vacancy Survey for 2023, the rental vacancy rate fell to a multi-decade low of 1.4%, down dramatically from 4.5% in 2021 (pandemic) and 3.63% in 2017 (pre-pandemic). The vacancy rate of apartments that rent below $1,650 was less than 1%.*
>
> NYC Comptroller, February 13, 2024

Equally as troubling, when presented with certain findings, DSS officials either shifted their responsibility to other entities or minimized the finding. We strongly encourage DSS to take a stronger oversight posture to proactively identify and mitigate weaknesses.

## Unreliability of Provider-Reported CARES Data

### Tracking Shelter Exits

DHS' CARES system is an electronic integrated case management system that aims to give DHS and shelter providers the ability to monitor households from initial intake to shelter exit. Shelter providers are required to enter households' data in CARES. The system is also used to upload households' documentation and generate reports, such as Shelter Exit Reports, in addition to generating Shopping Letters to those households who, based on a match of CARES and WMS data, are deemed potentially eligible for CityFHEPS. The CARES data plays an important role in identifying households who are potentially eligible for CityFHEPS and therefore its reliability is critical to CityFHEPS's mission.

We reviewed case files for 57 households identified on CARES Shelter Exit Reports as having exited the shelter system using CityFHEPS. However, we found inaccuracies with the exit information reported in CARES for the 57 households, as follows:

- For three cases, the household had not, in fact, exited the shelter and were, in essence, lost in the system and not pursued for housing. In response, DSS

officials indicated that the cases were coded incorrectly and suggested that, because the number was so small, it was not likely indicative of a larger-scale issue. However, upon further review, we found nine additional cases that were also coded incorrectly on Shelter Exit Reports.

- In two cases, the households were miscoded as exiting the shelter via CityFHEPS but, according to DSS officials, they were participating in other public assistance programs, not CityFHEPS.
- Seven households were reported as exiting the shelter via Augmented CityFHEPS, a form of CityFHEPS where rent for an apartment may exceed the maximum monthly rent levels as set forth in the Rules. However, further review showed that the households did not receive Augmented CityFHEPS, but rather exited using CityFHEPS.

We believe these findings point to a larger problem and illustrate the importance of diligent monitoring to ensure that households' exits are recorded and reported accurately.

Notably, an audit issued by OSC in January 2020, *Homeless Outreach Services in the New York City Subway System* (2018-S-59), found similar reliability issues with DHS' CARES data. Having the benefit of this knowledge in 2020, it would have been prudent for DSS to proactively take steps to ensure the integrity of the data it relies on to serve those in need. When asked how DSS ensures that CARES information is accurate and reliable, DSS officials responded that they are "continuously working to ensure controls in the CARES recording process around shelter exits." However, we found no evidence that DSS has taken any steps, such as conducting spot checks, audits, or risk assessments on CARES data. Lacking any such effort, DSS has no assurance that shelter clients are accurately accounted for and guided into permanent housing.

We also found one case where a household had received an Approval Notice indicating a single-person household, but there was no evidence that CARES had issued a Shopping Letter, without which households may not otherwise be aware of their potential eligibility for permanent housing under the CityFHEPS program. DSS officials responded that, in this case, the household was an adult family, and the Shopping Letter had been issued in the name of the head of the household who was ineligible for CityFHEPS.

## Documenting Key Exchange and Initial Check Disbursement

According to DSS Policy Bulletin 2021-009, after a CityFHEPS packet is approved, shelter providers make arrangements to obtain the initial rent checks from DHS and schedule a check disbursement and key exchange between the landlord and the household. The key exchange and check disbursement is documented using the Rental Assistance Key Release Agreement and Check Distribution form (DSS-7k). The form is signed by all parties involved, attesting that the keys were

received for the correct unit and check disbursement was made to the correct parties. The completed form is then sent to DHS.

Due to the inaccurate coding of cases in the CARES system, as explained above, our initial judgmental sample of 57 cases was reduced to 52 because five of the sampled cases were coded as exiting the shelter with CityFHEPS, when they did not. We requested case records, including DSS-7k forms, for the sampled 52 cases to determine if the key exchange and check distribution were properly documented and checks were disbursed to the appropriate parties. Despite the policy requirement, DSS officials could not provide evidence that the DSS-7k form was completed for any of the cases. Furthermore, DSS officials stated that shelter providers are responsible for ensuring that the key exchange occurs, adding that DHS acknowledges the key exchange has occurred when the shelter provider updates CARES with the household's permanent address and logs the household out of the shelter with an exit date.

Subsequently, during our audit field work, DSS issued an updated Policy Bulletin 2023-012, which, among other changes, eliminated the DSS-7k form as a requirement for documenting the key exchange and check distribution, thus making policy consistent with practice.

DSS officials later stated that this revised policy was part of DSS' efforts to improve efficiency. While we can appreciate these efforts, given the issues we have identified in this report and in our prior audit regarding the reliability of provider-reported information in CARES, which officials are now relying on to document key exchange in lieu of the DSS-7k, we have no assurance that reported dates for when households exited the shelter and when they received keys to their apartments are accurate or that the appropriate parties received the initial rent checks.

DSS needs to develop and implement appropriate measures to monitor the information recorded in CARES because it serves as the confirmation of household exit as well as proof that the key exchange occurred when the household is logged out of the shelter system.

# Poor Monitoring and Extensive Delays in the Overall CityFHEPS Process

## Protracted Delays in Securing Permanent Housing

According to data from DSS, between July 1, 2019 and May 14, 2023, Shopping Letters were issued to 50,584 households, of which 10,529 households (approximately 21%) were approved for CityFHEPS. We reviewed a judgmental sample of 52 cases from these 10,529 households to assess how long the approval process took.

For our sample of 52 cases, an average of 292 days—almost 10 months—had elapsed from issuance of their first Shopping Letter and approval for CityFHEPS and

subsequent exiting of the shelter into permanent housing. In one case, a household had to wait more than 3 years after receiving the first Shopping Letter before being approved for the program.

In response, DSS officials stated that the Rules do not specify a maximum amount of time households can stay in a shelter after a Shopping Letter is received. Nevertheless, given that DSS' goal is the coordination and provision of support services to help individuals and families who are homeless exit shelters as quickly as possible, it is DSS' responsibility under Directive One: Principles of Internal Control, to establish appropriate operational controls that will ensure the process is streamlined and efficient. Additionally, we found no evidence that DSS routinely monitors CARES to track the status of shelter residents, nor that it takes steps to conduct risk assessments and identify where bottlenecks might be occurring in the process so that action can be taken to mitigate them and minimize unnecessary delays and lengthy shelter stays.

We also noted that once a Shopping Letter is issued, a household is left on their own to seek out prospective landlords who would accept CityFHEPS. This hands-off approach is exacerbated by the fact that the Shopping Letter typically expires in 120 days. If the household is unable to find housing before the expiration date, the Shopping Letter will need to be re-issued.

DSS officials attributed lengthy shelter stays to factors such as household size and their location preference as well as the limited number of vacant housing units available. While we acknowledge these are contributing factors, as discussed later in this report, lengthy shelter stays directly relate to other deficiencies in DSS oversight that, if addressed, could further minimize delays in households securing permanent housing.

## Delays in Issuing Shopping Letters

Once households are determined to have met all CityFHEPS requirements, they are issued a Shopping Letter, which typically expires in 120 days. For households who are unable to find housing within that time frame, the Shopping Letter may be re-issued. According to DSS officials, for shelter residents, Shopping Letters are automatically generated based on CARES's daily match of potentially eligible shelter residents using information, including Cash Assistance (CA) status, in WMS. However, officials noted that a Shopping Letter will not be renewed if a client's employment circumstances or household composition changed, or their CA case was closed; in that case, the client's eligibility will need to be re-verified.

To determine the timeliness of Shopping Letter issuance, we reviewed issuance dates in CARES for our sample of 52 cases. Our review identified numerous examples of protracted delays in the issuance of Shopping Letters, resulting in longer shelter stays. For example:

- One household was issued three successive Shopping Letters: the first was issued 45 days after their CA case was opened. With each expiration

thereafter, it took 29 days and 10 days, respectively, for the Shopping Letter to be issued. During the entire course, the household's CA status remained open and there were no changes to the household's size or income. These delays in the issuance of Shopping Letters are contrary to the assertion of DSS officials that Shopping Letters are generated automatically based on having an active CA status.

- For two other households, it took 133 days and 80 days, respectively, after their CA case was opened before their Shopping Letters were issued.

DSS officials responded that the Rules do not state that another Shopping Letter must be generated prior to the expiration of the current Shopping Letter; only that households who meet eligibility criteria receive a Shopping Letter.

We note that, for shelter residents, the initial steps in the Shopping Letter procedure are largely automated: CARES generates Shopping Letters based on its daily matching of data with another integrated system (WMS). Thereafter, the steps are manual in nature: Shopping Letters are transmitted via a shared network drive to shelter providers, which then issue the letters to the shelter residents. The issuance time frames, not to mention the widely varying range (from 10 to 133 days), that we identified above are striking given the simplicity of this portion of the CityFHEPS application process. However, DSS has not issued guidance to control for efficiency at this stage, nor does it take any steps to monitor the timeliness of Shopping Letter issuance or to investigate where inefficiencies may be occurring to mitigate unnecessary delay.

## Delayed Subsidy Payments and Subsidy Overpayments

According to DSS Policy Bulletin 2021-009, CityFHEPS rental assistance payments are deemed timely if HRA issues them by the end of the month.

To determine whether CityFHEPS rental assistance payments were issued timely, we requested payment records, including check images, for the sampled 52 cases. However, DSS officials advised us that there were more than 2,000 physical checks issued over the audit scope period for the sampled cases and that it would be time-intensive to provide them to us. Consequently, DSS provided only 206 checks for 12 of the 52 cases. We reviewed the available payment information and determined that DSS did not make timely rental assistance payments in seven instances. Specifically, a December rental assistance payment was issued in April, and rental assistance payments for May through October were issued in November. In another case, DSS continued issuing rental assistance payments to the landlord for 2 months after the tenant moved from the housing unit back to the shelter. According to DSS, the landlord did not immediately notify the agency that the tenant had moved out, which resulted in an overpayment of $1,170. However, given that the tenant re-entered a DSS shelter, and this was recorded in the CARES system, it should have been evident that the tenant was no longer in an apartment that was being paid for with CityFHEPS funds. DSS officials did not provide evidence to show that they attempted to recoup the overpayment.

# Ineligible Disbursements of Unit Hold Incentives

According to Policy Bulletin 2021-009, a landlord who agrees to hold an eligible unit while the CityFHEPS application is being processed by HRA may receive a Unit Hold Incentive of 1 month's rent. Further, as told to us by DSS officials, Augmented CityFHEPS cases are not eligible for the incentive because HPD sets the rent of those units at fair-market levels. To be considered for the Unit Hold Incentive, a landlord (or their authorized agent) would complete and sign form HRA-145, certifying that the landlord owns or manages the unit, that the unit is currently vacant, and that the landlord agrees to not lease the unit to another party while the application is being processed. After the approval of the CityFHEPS application, DSS staff prepare the CityFHEPS check request form, which discloses the amount of the landlord's initial rent check, including the Unit Hold Incentive.

We asked DSS to provide us with all Augmented CityFHEPS cases as well as all CityFHEPS cases that received a Unit Hold Incentive. According to the data provided, from January 2019 to March 2024, the agency paid out approximately $45 million in Unit Hold Incentives to approximately 24,000 CityFHEPS landlords. We also found that 916 Augmented CityFHEPS cases received Unit Hold Incentives totaling $1.7 million, despite their ineligibility. DSS officials responded that shelter providers were utilizing a shared code and, therefore, the incorrect exit reason may have been used, and stated that they are currently reconciling data and that inappropriate incentive payments will be recouped. However, DSS officials did not provide any evidence supporting this assertion.

For 23 of our sampled cases, the landlords received a Unit Hold Incentive, with amounts totaling approximately $41,000. For these cases, we found the following:

- In 16 cases, accounting for approximately $31,000 in Unit Hold Incentives, DSS officials could not provide evidence that form HRA-145 was completed, as required. They stated that 15 cases were digitally processed in the HOME system—an online system used by providers to submit rental packets before DSS' new landlord management system, CurRent, came into use in January 2022—and did not require the HRA-145 form. DSS subsequently issued a revised policy (Policy Bulletin 2023-012) during our fieldwork to state that the Unit Hold Incentive form (HRA-145) is not required when the CityFHEPS packets are submitted via the HOME system.

- In one case, a landlord for an Augmented CityFHEPS unit received a Unit Hold Incentive of $2,467. DSS officials agreed that the unit was ineligible for the incentive and stated that the funds recoupment process will be initiated to have the funds returned. However, they have not provided any supporting documentation that the recoupment process was initiated.

DSS does not have a process to verify that Unit Hold Incentives are only paid to eligible landlords, thereby ensuring that ineligible landlords, such as Augmented CityFHEPS landlords, are excluded. Without such a safeguard in place, there is no assurance that only eligible landlords are benefiting from the incentives.

# Rent Payments in Excess of CityFHEPS Maximum Rent

The NYC Department of Housing Preservation & Development (HPD) and the NYC Housing Development Corporation (HDC) provide affordable housing by allocating a certain number of units in apartment buildings for households who reside in shelters and meet certain income requirements. Typically, these units are subject to a regulatory agreement or a similar instrument between HPD or HDC and the property owners, and the established rent may exceed the maximum allowed CityFHEPS subsidy. In such cases, the Rules allow HRA to pay the property owners above the maximum allowed CityFHEPS rent. DSS refers to such cases as Augmented CityFHEPS.

According to data from DSS, there were 4,441 Augmented CityFHEPS cases between February 2020 and September 2023.

## Lack of Transparency Over the Augmented CityFHEPS Process

For 21 of our sampled cases, HRA approved rents that exceeded the maximum monthly rent. DSS officials informed us that the households who received Augmented CityFHEPS are selected through NYC Housing Connect or referred through a coordinated process between DSS and HPD. To get a better understanding of the process, we met with HPD officials, who informed us that, in order for households to be selected for a unit to which Augmented CityFHEPS can be applied, the household must first complete a HPD Homeless Housing Application at DHS. The Homeless Housing Application is then transmitted to HPD, where the household is subsequently matched on a first come, first served basis, based on factors such as household size and location preference.

However, when we asked DSS officials to provide us with guidelines governing Augmented CityFHEPS, we were informed that DSS has not published any such policies, and we were instead provided with documents that outlined the process for households to apply for lottery units through NYC Housing Connect as well as an FAQ document regarding Augmented CityFHEPS.

Notably, in one case, we found an approval notice that indicated that a single-person household was approved to move into a two-bedroom apartment. The apartment building had amenities that included a fitness club, game room, resident lounge, and community boat house. The building was subject to a regulatory agreement that required the owner to lease no fewer than 114 units to tenants referred by DHS, HPD, or an alternate referral source acceptable to HPD and HDC. DSS processed this case as a two-person household; however, we found that one of the two members of the household was not eligible for CityFHEPS.

As a result of DSS not having sufficient written procedures for Augmented CityFHEPS, and the lack of communication between DSS and HPD regarding the

client selection and eligibility for Augmented CityFHEPS, we have no assurance DSS matches households to proper units.

## Unsupported CityFHEPS Subsidy Calculation

According to the Rules, the monthly CityFHEPS rental assistance amount will equal the actual monthly rent for the CityFHEPS unit, up to the maximum monthly rent set by HRA. If the tenant is responsible for paying any of the utilities, a utility allowance is to be deducted from the maximum monthly rent. The utility allowance is determined based on the typical cost of utilities and services paid by households for comparable housing. The utility allowance is set by HRA at the standard adopted by the New York City Housing Authority.

For example, if the rent is listed as $2,000 per month and the tenant is responsible for paying $30 for cooking gas, the maximum rent that CityFHEPS payments can be applied to cannot exceed $1,970.

According to DSS Policy 2021-009, landlords are required to provide utility information for DSS to determine the correct utility allowance to deduct from the maximum payment standard. On August 24, 2021, DSS began using the Landlord Utility Information form to assist with identifying which utilities landlords would be responsible for paying and calculating the utility allowance—a procedural control that would ensure households are being charged the correct rent amount.

Of our sample of 52 cases, four were approved for Augmented CityFHEPS after August 24, 2021 and should have had a Landlord Utility Information form documenting the utility allowance calculation. However, DSS officials could not provide the forms or identify the utility allowance that each household was entitled to. DSS officials responded that the Landlord Utility Information form was not required for the four cases because landlords of Augmented CityFHEPS units are responsible for covering all utility expenses. However, neither the information that DSS subsequently provided to us regarding this policy nor the information that we received from a landlord supported this assertion.

Despite establishing the Landlord Utility Information form as a way to ensure households are being fairly charged, DSS does not provide adequate oversight to ensure staff are using it. Lacking this information, there is no assurance that the subsidy was calculated correctly, and disadvantaged households could be paying for utilities that their landlords are responsible for.

## Lack of Oversight of CityFHEPS Subchapter B Units

In 2021, HPD provided a loan of $122.6 million to Neighborhood Renewal Housing Development Fund Corporation (Neighborhood Renewal), a not-for-profit organization, to acquire 14 buildings in the Bronx. In turn, Neighborhood Renewal entered into Management and Pre-Development Agreements (MPAs) with four

developers designated by HPD to operate, manage, develop, and eventually take ownership of the properties. According to the MPAs, certain units in the acquired properties should be leased to CityFHEPS recipients.

Also in 2021, DSS entered into human service contracts, referred to as Master Lease Agreements (Agreements) with the four developers and/or their affiliates—specifically, Bowery Residents' Committee (BRC), M.B.D. Community Corporation (MBD), Concourse House, and Settlement Housing Fund (SHF) (contractors)—to provide permanent housing and a range of supportive social services, such as referrals for employment-related services, food pantry resources, medical, and mental health or substance use counseling services, to the tenants. The Agreements are worth nearly $447 million over 30 years. According to the Agreements, DSS will also make monthly rent payments to the contractors for CityFHEPS units as long as the units are made available to eligible clients referred by DHS.

We found DSS has not provided adequate oversight of Subchapter B contractors to ensure that units are managed efficiently and effectively and made available to eligible clients referred by DHS, that rental payments are appropriate, and that units meet safety and habitability standards.

## Vacant Subchapter B Units

To determine if the contractors provided the 567 units for use by CityFHEPS households, we reviewed the respective properties' rent rolls for calendar year 2023. We found that, as of December 2023, 116 of the 567 units (approximately 20%) designated for CityFHEPS tenants remained vacant (see table below).

**Vacant Units, by Contractor, as of December 2023**

| Contractor | Number of Units Required per Contract | Units Occupied | Units Vacant |
|---|---|---|---|
| BRC | 151 | 104 | 47 |
| MBD | 152 | 132 | 20 |
| Concourse House | 128 | 100 | 28 |
| SHF | 136 | 115 | 21 |
| Totals | 567 | 451 | 116 |

DSS officials and the contractors we met with informed us that the vacant units are uninhabitable. However, DSS has not conducted in-person inspections to independently verify this information.

In response to our finding, DSS officials stated the MPAs are between Neighborhood Renewal and the four contractors, and Neighborhood Renewal is responsible for managing the properties and ensuring that the renovations are made. Additionally, they stated that the contracts are overseen by HPD, and that there was no need to conduct habitability assessments because the units were known to be uninhabitable from the outset and maintaining vacant units in advance of major rehabilitation is standard practice.

DSS' assertions notwithstanding, given DSS' substantial investment in the contractors to provide not only units but also services for tenants, that DSS does not feel a responsibility as the steward of these funds to obtain firsthand knowledge is concerning. More attentive oversight, including in-person inspections, would inform DSS of the current condition of the units, would enable DSS to monitor contractors' progress in renovating them and to have some assurance of the time frame for occupancy, and help DSS plan for when applicants will be able to leave shelters and take advantage of the supportive social services available to them.

## Payments for Vacant Subchapter B Units

According to the Agreements, contractors receive two payments per month: one for CityFHEPS rent and the other for contracted services. The contractors are paid rent for CityFHEPS units as long as the units are made available to eligible clients referred by DHS. At the start of each year, contractors submit to DSS a monthly rent payment schedule for CityFHEPS units. If a unit becomes vacant, the contractor will continue to receive the rent payment, provided that efforts are made to fill the vacancy within 30 days of the tenant's departure. If the unit is not filled within the 30-day period, the contractor is required to send a vacancy extension request to DSS, which can approve or deny the extension request.

To determine whether DSS paid contractors for Subchapter B units according to the Agreements, we reviewed supporting records, including rent rolls and rent payments for calendar year 2023. We also requested that DSS provide contractors' annual payment schedules and vacancy extension requests, but DSS did not give us this information. Based on the information available to us, for calendar year 2023, DSS paid $5.1 million in CityFHEPS rent payments to the four contractors for the 451 units occupied by CityFHEPS clients as of December 2023.

During this period, two households moved out of their units. For these units, DSS continued to pay rent to the contractor beyond the 30-day time frame—for 1 and 8 months, respectively—with payments totaling $8,944. For these cases, DSS could not provide records showing that the contractor submitted vacancy extension requests and made efforts to fill the vacancy within 30 days of the tenant's departure, and that DSS approved these vacancy extension requests. Therefore, we could not ascertain whether the $8,944 in CityFHEPS rent payments for the vacant units were warranted.

For these two cases, DSS officials agreed that payments were made for vacant units and stated they will follow up with the contractors to address any discrepancies and make necessary adjustments.

We also found a third case where, according to the rent roll, the household moved out of the unit on February 7, 2023, but the unit remained on the rent roll until October 2023, and we found that the contractor continued to bill DSS for the CityFHEPS subsidy amount for this household. The rent billed for this household totaled $4,005.

DSS does not provide oversight of the Agreements related to Subchapter B and lacks proper controls, including maintaining documentation of payments, to ensure contractors are complying with Agreement requirements and that CityFHEPS rental payments to contractors are appropriate.

## Delayed Renovations

According to the MPAs, the developers were to secure and close on construction loans to finance the rehabilitation of the 14 Subchapter B buildings within 2 years, or by June 2023. In addition, the developers were to have approved plans, specifications, and building permits for the rehabilitation by the deadline of achievement outlined in Neighborhood Renewal's Management and Pre-Development Handbook (Handbook), which was given to the developers. As described in the MPAs, the Handbook outlines the duties and the timeline for when each task must be performed and completed.

Given that the information in the Handbook was essential to this component of our audit, we requested Neighborhood Renewal provide us with a copy. Neighborhood Renewal did not comply with this request and instead sent a copy of its 2018 Third-Party Transfer Handbook. Alternatively, to obtain the needed information, we provided Neighborhood Renewal with a list of questions covering duties and task timelines and also scheduled a meeting with Neighborhood Renewal, but officials subsequently canceled the meeting. Instead, DSS requested a meeting with us, where they voiced their concerns about our questions posed to Neighborhood Renewal. Specifically, DSS officials claimed that because the Subchapter B properties are managed under HPD contracts, our request was outside of the scope of the audit. We disagree. The MPAs state that certain units within the properties will be permanent housing occupied by and leased to individuals and families who have been determined by HRA to be eligible to receive a CityFHEPS subsidy in connection with exiting the City's shelter system. As such, we believe our questions to developers who manage properties designated for CityFHEPS recipients are relevant and within the scope of the audit.

To date, none of the developers have obtained construction loans or developed a timeline for capital improvements and rehabilitation work, as required by the contract. Both Neighborhood Renewal and the contractors we met with advised us that rehabilitation work had not begun at any of the sites.

In a written response, DSS officials disagreed with our finding and stated that the MPAs, including the Handbook and the agreements, are between Neighborhood Renewal and HPD. They further stated that the agreements are not applicable to DSS' CityFHEPS program and, therefore, the findings do not apply. They also stated that DSS is not a signatory or the enforcer of the contract as it is solely an ancillary party, that the Handbook is not applicable to the CityFHEPS subsidy and is not a guide that was issued by DSS, and that, per Chapter 8 of Title 28 of the Rules, there is an undefined set of time to complete repairs to the buildings.

We disagree with the views of DSS officials and note that the Agreements signed by DSS state that the "MPA or Master Lease between Contractor and Owner/Landlord must be reviewed and approved by [DHS] prior to execution of the contract." Therefore, DSS has a role in these Agreements.

Because developers have not secured the construction loans and started rehabilitation work, Subchapter B units that need capital improvements may not be available to CityFHEPS clients. Moreover, because the contractors have not established the required timeline, it is unclear when the units will be available to CityFHEPS recipients.

## Poor Physical Condition of Buildings

As the Rules outline, each Subchapter B unit must pass a safety and habitability assessment performed by DSS or another public agency approved by DSS prior to CityFHEPS tenants moving in.

To determine if CityFHEPS households were placed in safe and habitable housing units, we reviewed building information data found on HPD Online, a website that documents information such as complaints and violations. We also visited Subchapter B sites and interviewed officials from their respective property development and management organizations. During a visit, we observed several vacant apartments that needed extensive renovations (see Exhibit B for conditions in one of the apartments).

Our review found that, as of March 12, 2024, units in Subchapter B buildings had a total of 5,374 open violations,2 including 1,396 Class C (immediately hazardous) violations. Some examples of open Class C violations include self-closing fire doors that were missing or defective, mouse/rat infestations, roach infestations, visible mold greater than 30 square feet, and peeling lead paint. For instance, a Class C violation for peeling lead paint has been outstanding since October 2022. Further, in one case, DSS placed a CityFHEPS household in a Subchapter B unit that had 65 open violations, including 24 Class C violations.

We found that DSS or a DSS-approved agency did not conduct physical inspections to confirm the safety and habitability of Subchapter B units. According to DSS officials, HPD is the primary agency responsible for enforcing the standards relating to the physical condition, including but not limited to all relevant building codes, rules, regulations, and policies. While we acknowledge that HPD has enforcement authority over housing codes, rules, and regulations, DSS cannot ensure that households

---

2    Class A violations must be corrected within 90 days. Examples include: no peephole in the entrance door of the dwelling unit; unlawfully keeping of pigeons, chickens; improper seat for a water closet; and no street number on the front of the dwelling. Class B violations must be corrected within 30 days. Examples include: inadequate lighting facilities for public halls and stairs, owner has not provided an approved smoke detector in dwelling unit, unlawful bars or gates on windows opening to fire escape. Class C violations must be corrected within 21 days. Examples include: inadequate supply of heat and hot water, rodents, peeling lead paint in dwellings where a child under 7 resides, broken or defective plumbing fixtures, defective plaster, defective faucets.

receiving CityFHEPS are placed in safe housing without conducting independent safety and habitability assessments.

DSS officials also stated that CityFHEPS does not require inspections for habitability when the households remain in a unit, and the households currently residing in these Subchapter B units were already living there when the Subchapter B designation was made. While we acknowledge that the Rules do not require inspections when households remain in a unit, not performing inspections is counter to DHS' mission of helping individuals and families to transition from shelter into permanent housing. Furthermore, according to data from the rent rolls, DSS placed at least 51 households into Subchapter B units during the period July 1, 2021 to September 1, 2023 and officials did not provide any evidence that safety and habitability assessments were conducted at the time, as required by the Rules.

Because DSS has not conducted safety and habitability assessments or regular inspections of Subchapter B units, tenants can continue to live in hazardous conditions for years.

# Recommendations

1. Implement a system that appropriately monitors clients' eligibility for CityFHEPS and ensure that Shopping Letters are issued and renewed in a timely manner.

2. Routinely monitor client case management records in DHS' CARES for potential errors and update/correct accordingly.

3. Update Policy Bulletins in a timely manner to reflect changes in CityFHEPS policies and procedures.

4. Establish a process to assist eligible clients in their search to find permanent housing upon issuance of the Shopping Letter.

5. Establish proper internal controls over CityFHEPS payments to landlords, including monitoring of incentives, and recoup any overpayments or improper payments, as warranted.

6. Develop and implement policies and procedures with regards to the administration of Augmented CityFHEPS.

7. Improve controls related to Subchapter B units, including but not limited to:

   - Establishing proper policies and procedures related to the administration of Subchapter B units.

   - Monitoring monthly rent payments to ensure that DSS is only paying for units that are occupied by CityFHEPS clients.

   - Performing regular physical inspections of units to ensure their habitability for CityFHEPS clients. Coordinate this effort with HPD if necessary.

   - Ensuring that contractors offer vacant units to eligible CityFHEPS clients as required by Agreements.

8. Coordinate efforts with HPD to ensure that Subchapter B unit rehabilitations are completed in accordance with Management and Pre-Development Agreements and in a timely manner.

# Audit Scope, Objective, and Methodology

The objective of our audit was to determine whether DSS is administering the CityFHEPS program according to the rules and regulations, thereby assisting DHS shelter residents in securing permanent housing. The audit covered the period from July 2019 through December 2023.

To accomplish our objective and assess related internal controls, we interviewed DSS officials, HPD officials, owners, developers, contractors, officials at property management companies, and CityFHEPS recipients. We also visited Subchapter B properties, observed units, and reviewed case documentation. We reviewed relevant laws, DSS policies and procedures, and contracts relevant to the administration of CityFHEPS.

We used a non-statistical sampling approach to provide conclusions on our audit objectives and to test internal controls and compliance. We selected judgmental samples. However, because we used a non-statistical sampling approach for our tests, we cannot project the results to the respective populations. Our samples, which are discussed in detail in the body of our report, as a single sample, include:

- A judgmental sample of 35 out of 6,245 households who exited CityFHEPS during 2022, selected to ensure five households from each of the seven types of households, to verify household and landlord eligibility and payment calculations and information.
- A judgmental sample of 22 out of 4,551 households who exited from Augmented CityFHEPS between July 2019 and August 2023, based on risk factors such as review (or lack of one), missing Social Security numbers, and when the household exited, to verify household and landlord eligibility and payment calculations and information.

During the course of our audit work, we found that five of the 57 households had not exited CityFHEPS, which reduced our samples to 32 and 20, respectively, for a total of 52 households discussed in the body of the report.

We obtained data from CARES and CurRent but were only able to test the accuracy of that data. As it was the only data available to us about CityFHEPS, we used it to draw samples and then corroborated the data in CARES and CurRent against other records about households participating in CityFHEPS, as documented in our report.

# Statutory Requirements

## Authority

The audit was performed pursuant to the State Comptroller's authority as set forth in Article V, Section 1 of the State Constitution and Article III of the General Municipal Law.

We conducted our performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objective. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objective.

As is our practice, we notify agency officials at the outset of each audit that we will be requesting a representation letter in which agency management provides assurances, to the best of their knowledge, concerning the relevance, accuracy, and competence of the evidence provided to the auditors during the course of the audit. The representation letter is intended to confirm oral representations made to the auditors and to reduce the likelihood of misunderstandings. Agency officials normally use the representation letter to assert that, to the best of their knowledge, all relevant financial and programmatic records and related data have been provided to the auditors. They affirm either that the agency has complied with all laws, rules, and regulations applicable to its operations that would have a significant effect on the operating practices being audited, or that any exceptions have been disclosed to the auditors. However, officials at the New York City Mayor's Office of Operations have informed us that, as a matter of policy, mayoral agency officials do not provide representation letters in connection with our audits. As a result, we lack assurance from agency officials that all relevant information was provided to us during the audit.

## Reporting Requirements

We provided a draft copy of this report to DSS officials for their review and formal comment. Their comments were considered in preparing this final report and are attached in their entirety at the end of it. In their response, DSS officials disagreed with most of the report's recommendations but agreed or partially agreed with others, and indicated actions they have taken or will take to implement them. Our responses to certain DSS remarks are embedded within DSS' response as State Comptroller's Comments.

Within 180 days after final release of this report, we request that the Commissioner of the New York City Department of Social Services report to the State Comptroller, advising what steps were taken to implement the recommendations contained herein, and where recommendations were not implemented, the reasons why.

# Exhibit A

## CityFHEPS Application Process for DHS Shelter Residents



# Exhibit B

## Condition of a Vacant Subchapter B Apartment
### Walton Avenue, Bronx, New York City







# Agency Comments and State Comptroller's Comments



**Department of Social Services**
Human Resources
Administration

Department of
Homeless Services

**DSS Accountability Office**

**Molly Wasow Park**
Commissioner

**Jill Berry**
DSS First Deputy
Commissioner

**Bedros Leon Boodanian**
Chief Accountability Officer

**161 West Broadway**
New York, NY 10013

212 274 5800 tel

boodanianb@dss.nyc.gov

W-2-548
Rev. 05/23

October 11, 2024

Mr. Kenrick Sifontes
NYS Office of the State Comptroller
59 Maiden Lane, 21st Floor
New York, NY 10038

**Re: Agency Response to the Draft Audit Report of the NYC Department of Social Services Administration of the CityFHEPS Program for Department of Homeless Services Shelter Residents (2023-N-1)**

Dear Mr. Sifontes,

This letter is in response to the Draft Report of the Office of the State Comptroller's (OSC) Audit of the Department of Social Services (DSS) Administration of the CityFHEPS Program for the Department of Homeless Services (DHS) Shelter Residents (2023-N-1).

We appreciate OSC's interest in our Agency's critical work. The Report presents useful information about the CityFHEPS program. However, it also contains multiple inaccuracies and misstatements regarding DSS' administration of the CityFHEPS program, despite DSS making itself available for many meetings and interviews, and all of the documents that DSS shared with the auditors. We elaborate on this point in the specific recommendation responses below.

**State Comptroller's Comment** – Our audit report does not contain inaccuracies and misstatements regarding DSS' administration of the CityFHEPS program. The audit was conducted in accordance with generally accepted government auditing standards (GAGAS), and our findings and conclusions were based on the evidence made available by DSS officials or the lack thereof.

1

Although the Report mentions the current New York City vacancy rate of 1.4% as the lowest since 1968, it fails to consider its impact on the challenges in obtaining affordable housing. This real-world fact contributes to the tremendous difficulty and complexity of this work.

DSS would also like to contest OSC's statement on page 8 of the Report, where OSC alleges that "DSS officials deflected *"responsibility to other entities, and minimized the finding"*, as related to the issuance of the Shopping Letters, reliability of CARES data, oversight of rent payments, and Subchapter B apartments. In addition to being factually inaccurate, this statement demonstrates OSC's lack of understanding of the CityFHEPS rental subsidy process and the overall affordable housing situation in New York City.

**State Comptroller's Comment** – We made certain changes on page 8 of our report to improve clarity; however, the overall substance of our statement remains the same. We did not misunderstand the CityFHEPS process. During the audit, DSS provided written responses that repeatedly deflected responsibilities to other entities rather than acknowledging its role in the program, stating, for instance, that HPD had oversight responsibility of Subchapter B contracts and that Neighborhood Renewal was responsible for managing properties and ensuring renovations are made. Additionally, despite auditors finding exits incorrectly coded in 21% of the cases we reviewed, DSS minimized the finding, describing having a fifth of their reviewed cases coded incorrectly as "a handful of cases." Additionally, DSS, despite being responsible for oversight of the program, took no responsibility for these errors, stating that the shelter providers were responsible for the data entry. These are examples of DSS minimizing our findings and shifting responsibilities to other parties despite being the entity responsible for administering the CityFHEPS program.

We have addressed in detail the findings related to the issuance of the Shopping Letters, reliability of CARES data and the oversight of rent payments below and in the enclosed Corrective Action Plan (CAP), in addition to the many meetings with OSC. As to the Subchapter B apartments, the Agency's primary goal is to use project based CityFHEPS to expand the supply of affordable housing. This can be done in two ways. First, the contracts can be used to support acquisition of move-in ready buildings that would otherwise be market rate housing. Alternatively, the contract can help to support the financing package for substantial rehabilitation in conjunction with the Housing Preservation & Development (HPD). In these cases, Subchapter B contracts help to expand the City's portfolio of affordable housing by making a construction loan closing financially viable, so the buildings for existing and future residents exiting from shelter to permanency represent high quality affordable housing. The necessary rehabilitation would not be possible without the project-based rent structure. As such, DSS will be amending and restating contracts to facilitate calendar years 2024 and 2025 loan closings led by HPD. This work is actively underway, but OSC's Report not only understates the significant effort and time it takes to get deeply distressed occupied buildings to a construction loan closing but also fails to understand each Agency's role in the process. We were never deflecting our responsibilities, rather we have explained each Agency's role in the process to the auditors on numerous occasions. To indicate

2

that we deflected our responsibilities is frankly insulting to the very hard work being done to expand the vacancy rate as it relates to affordable housing.

**State Comptroller's Comment** – We did not understate the significant effort and time it takes to get deeply distressed occupied buildings to a construction loan closing, nor did we misunderstand each agency's role in the process. Given the City's significant financial investment in Subchapter B units and the ongoing affordable housing shortage, it is essential that DSS improve controls over Subchapter B units, as recommended in our report. Further, according to the MPA, contractors were supposed to secure loans to finance the rehabilitation work of the 14 Subchapter B buildings within 2 years, or by June 2023. It is concerning that the City provided a $122.6 million loan for the acquisition of the properties in 2021, and DSS entered into agreements worth nearly $447 million with the developers and/or their affiliates that same year, and yet, as of the end of our fieldwork, there were still no timelines for when rehabilitation work would be completed and units made available to CityFHEPS clients.

Additionally, despite our multiple efforts to explain to OSC that these buildings were acquired in an already-poor condition and were awaiting renovations, OSC included photographs of these apartments on page 25 of their Report. Adding photos of the *vacant* apartments that we are currently working with HPD to renovate is inflammatory and can easily misinform the public. To that end, we request that these photographs be stricken from the Final Report, as they are misleading and paint an inaccurate picture.

**State Comptroller's Comment** – Exhibit B, clearly labeled as "Condition of a Vacant Subchapter B Apartment," accurately depicts the condition of a vacant Subchapter B unit. Our report does not state or imply that this unit, in its current condition, will be occupied by a CityFHEPS client.

As such, DSS disagrees with five of eight of the recommendations from OSC, as is explained in detail below as well as in the enclosed CAP.

**State Comptroller's Comment** – We encourage DSS to more carefully review our recommendations, as they are intended to strengthen and improve processes and internal controls related to a very critical and costly subsidy program.

3

**Recommendation 1:**
*Implement a system that appropriately monitors clients' eligibility for CityFHEPS and ensure that Shopping Letters are issued and renewed in a timely manner.*

As DSS explained to OSC on several occasions, the generation and renewal of CityFHEPS Shopping Letters is generally automated based on each client's individual Cash Assistance (CA) benefits eligibility status recorded in the Office of Temporary and Disability Assistance (OTDA) Welfare Management System (WMS) and the DHS Client Assistance and Rehousing Enterprise System (CARES). When clients remain in eligible status, the Shopping Letter is regenerated automatically fifteen days prior to expiration of the current Shopping Letter. For those whose circumstances have changed, the timing of the Shopping Letter generation depends on each individual's circumstances, as one resident's CA case may be closed while another's may be active. When a Shopping Letter does not renew, that is typically an indication that the household is not currently eligible. Additionally, DHS staff can issue manual Shopping Letters should the need arise.

**State Comptroller's Comment** – As noted on pages 11 and 12 of our report, and contrary to DSS' assertions, we found instances where households had active CA cases with no change in their circumstances, and a Shopping Letter was not issued or renewed. Therefore, we stress the importance of monitoring clients' eligibility and ensuring that Shopping Letters are issued and renewed in a timely manner.

**Recommendation 3:**
*Update Policy Bulletins in a timely manner to reflect changes in CityFHEPS policies and procedures.*

As OSC stated on page 6 of the Report, *"since the inception in 2018 through January 2024, CityFHEPS... helped 87,588 individuals to secure permanent housing."* Given the Agency's critical assistance to *tens of thousands* of people with limited resources, and the ever-evolving improvements in the process for the past six years, there may be delays between implementing a policy change and the recording of it in staff guidance documents. Additionally, as some policy changes may result in changes within systems, at times the guidance for staff must follow the roll-out schedule of the impacted systems.

**State Comptroller's Comment** – It is good internal controls to establish guidance before implementing programs that are funded with taxpayer dollars. As noted in our report, while DSS officials told us that landlords of Augmented CityFHEPS cases are not eligible for Unit Hold Incentives, the 2021 Policy Bulletin related to the administration of the CityFHEPS program does not include this guidance and does not have a process for verifying that Unit Hold Incentives are paid only to eligible

4

landlords. A lack of timely policies and procedures can lead to issues similar to the one highlighted in our report, where, according to the data, 916 Augmented CityFHEPS cases inappropriately received Unit Hold Incentives. We reiterate the importance of timely updating Policy Bulletins when DSS changes CityFHEPS policies and procedures so staff know how to properly execute important functions.

**Recommendation 4:**
*Establish a process to assist eligible clients in their search to find permanent housing upon issuance of the shopping letter.*

DHS assists clients in their search to find permanent housing from day one. OSC's recommendation demonstrates further lack of understanding of this process. DSS/DHS already assists clients in their search for permanent housing. This begins at the point of shelter entry, which depending on household circumstances may be well before the issuance of the Shopping Letter and this assistance continues until the move-out from shelter occurs. This assistance involves general case management services, providing clients with the necessary tools to ensure employment can be obtained (so that clients are able to maintain permanent housing after exiting shelter), meetings with housing specialists and other social services available through our Agency and non-profit shelter providers. The primary task of our shelter housing specialists -- fully funded through the DHS contracts -- is to find apartment leads. Additionally, the Agency actively searches for available housing units in the private market via the DHS apartment search team and the Public Engagement Unit. These apartments are made available to all shelter providers on behalf of clients through the HOME Program.

**State Comptroller's Comment** – DSS provided no evidence that the agency actively supports clients in their search for permanent housing once the Shopping Letter has been issued. In fact, DSS' Policy Bulletin and the Shopping Letters issued to clients state that it is the clients' responsibility to look for and find housing. Additionally, the shelter provider we visited informed us that, while they recommend brokers, it is incumbent on the client to search for apartments. While we recognize the current shortage of affordable rental units, we emphasize that DSS' support is imperative. Despite our numerous meetings with DSS officials, there was no mention of the DHS apartment search team and the Public Engagement Unit during the audit or in response to our preliminary reports.

Further, the Agency provides regular and ongoing training to, and shares best practices with, our shelter providers to ensure they are fully equipped to move clients through this process expeditiously.

We again remind OSC that this housing search and the services provided, as outlined previously, occur within the broader context of the NYC rental market which currently has a rental vacancy rate of 1.4%, and is considerably lower than 1.4% for affordable rental units. For example, for households searching for units under $1,100, the vacancy rate was only 0.39%. While this vacancy rate creates a real hardship in finding affordable housing, DSS still continues to move out record numbers of clients.

As an added note, shelter exit plans are tailored to client circumstances and choice

5

(recognizing that this choice may include several factors for consideration, such as schools that children are attending or medical facilities that are tied to the client or family). There is no one-size-fits-all solution for housing; circumstances and choice must be considered.

**State Comptroller's Comment** – We recognize there is no one-size-fits-all approach or solution and our report does not make that suggestion. We encourage DSS to provide appropriate support to clients—through their shelter providers or other appropriate DSS units—when Shopping Letters are issued in order to assist clients in finding apartments and moving out of shelters sooner.

Overall, DSS has increased permanent housing placements from DHS shelter by more than 20% year over year, which is evidence of the success of the processes in place to assist clients in their housing search despite market conditions.

**Recommendation 7:**
*Improve controls related to Subchapter B units (refer to OSC's Report for details).*

**Agency Response:**
The intent of the Subchapter B projects is misstated in the Report. DSS *purposely* worked to expand the vacancy rate for affordable housing by working with HPD to ensure dilapidated apartments are renovated and we can move more clients from shelter to permanent housing.

The Subchapter B buildings were last used for scatter-site DHS shelter units and were not suitable for long-term affordable housing unless they were provided with additional funding for extensive repairs. DSS is proud of our work through CityFHEPS to partner with HPD and the non-profit developers who are seeking financing for *substantial rehabilitation* of these units. Part of this process requires temporary tenant relocation to perform construction work. There are tenants linked to a vast majority of the units, but some tenants have been temporarily relocated to make the necessary rehabilitation work possible. Without a project-based rent contract, the not-for-profit developers cannot leverage sufficient private debt to make these rehabilitation projects viable, and the buildings will continue to languish in disrepair.

**State Comptroller's Comment** – Our report does not discuss or misstate the intent of the agreements related to Subchapter B units. It merely states services the contracted entities must provide in accordance with the agreements.

**Recommendation 8:**
*Coordinate efforts with HPD to ensure that Subchapter B unit rehabilitations are completed in accordance with Management and Pre-Development Agreements and in a timely manner.*

As DSS mentioned to OSC on multiple occasions, DSS is already coordinating with HPD on these development projects. The closing timelines are based on a variety of factors including availability of city capital, the scope of the project, such as how much work must go into each unit to make them livable, provider readiness and private

6

market financing conditions (i.e. interest rates).

**State Comptroller's Comment** – While we recognize DSS' efforts in helping transition shelter clients to permanent housing, given the City's significant investment in Subchapter B units and the ongoing affordable housing shortage, it is essential that DSS improve controls over Subchapter B units, as we recommend in the report. We note that the developers entered into contracts in 2021, and 3 years later, there is still no definitive timeline for the rehabilitation work.

In conclusion, DSS remains committed to its mission of serving New York City's most vulnerable population in the most efficient and effective manner, while adhering to all applicable rules, regulations, and laws by which we are bound.

We are confident that our response to this audit demonstrates the Agency's commitment to continually improving our operations. Should you have any questions regarding the enclosed, please contact Victoria Arzu, Executive Director of the DSS External Audit Facilitation Team (EAFT) at 929-221-7067.

Yours sincerely,

*Christine Maloney*

Christine Maloney
Deputy Commissioner, Office of Audit & Quality Assurance Services

7

NYC DEPARTMENT OF SOCIAL SERVICES
OFFICE OF AUDIT SERVICES
CORRECTIVE ACTION PLAN
DRAFT REPORT RESPONSE

Audit Name: Office of the State Comptroller – CityFHEPS Rental Assistance Program
Audit Number: 2023-N-1

Date: 10/11/2024

| Auditor's Recommendations | Agency Response | Responsible Unit | Agency Corrective Action | Target Date |
|---|---|---|---|---|
| **Recommendation 1:**<br><br>Implement a system that appropriately monitors clients' eligibility for CityFHEPS and ensure that Shopping Letters are issued and renewed in a timely manner. | **Agency Disagrees**<br><br>As previously explained, the generation and renewal of CityFHEPS Shopping Letters in the DHS system is generally automated based on data in the state Welfare Management System (WMS) and the DHS CARES system. Shopping Letters are generated fifteen days prior to expiration if a client is still eligible for CityFHEPS. If a new letter was not generated prior to the expiration of the current letter that would mean that either the client's Cash Assistance (CA) case is closed, or circumstances with employment or household composition have changed such that they are no longer eligible for a Shopping Letter. When client circumstances change again, such that they are eligible, a new letter will generate automatically. Clients who are eligible for a Shopping Letter but are not active on Cash Assistance can request a manual letter through DHS.<br><br>Also, note that there is no City Rule indicating that a new Shopping Letter must be generated prior to the expiration of a current letter. The CityFHEPS Rule requires that households meet the eligibility criteria in order to receive the letter.<br><br>**State Comptroller's Comment** – Contrary to DSS' assertions, we found instances where households had active CA cases with no change in their circumstances, and a Shopping Letter was not issued or renewed. Therefore, we stress the importance of monitoring clients' eligibility and | N/A | N/A | N/A |

NYC DEPARTMENT OF SOCIAL SERVICES
OFFICE OF AUDIT SERVICES
CORRECTIVE ACTION PLAN
DRAFT REPORT RESPONSE

Audit Name: Office of the State Comptroller – CityFHEPS Rental Assistance Program
Audit Number: 2023-N-1

Date: 10/11/2024

| Auditor's Recommendations | Agency Response | Responsible Unit | Agency Corrective Action | Target Date |
|---|---|---|---|---|
| | ensuring that Shopping Letters are issued and renewed in a timely manner. | | | |
| **Recommendation 2:**<br><br>Routinely monitor client case management records in DHS CARES for potential errors and update/correct accordingly. | **Agency Partially Agrees**<br><br>The State Comptroller is citing a handful of cases where the exit reasons were coded incorrectly.<br><br>**State Comptroller's Comment** – Approximately 21% of the cases we selected for review had exit reasons coded incorrectly—which is more than a "handful of cases."<br><br>DSS is continuously working to ensure appropriate controls exist in the CARES system recording process around shelter exits. The system and procedures are evolving and may, at times, need to catch up to a new initiative.<br><br>Effective April 2024, the Agency instituted additional measures by documenting the reason for shelter exits in the check distribution process, prior to exit from shelter, to ensure that the information providers are entering is specific and accurate to applicable exit reasons.<br><br>In addition, the Agency conducts monthly training sessions to reinforce that accurate exit codes are used by staff | DHS Rehousing | Update exit reasons in CARES. | Completed April 2024 |
| **Recommendation 3:**<br><br>Update Policy Bulletins in a timely manner to reflect changes in CityFHEPS policies and procedures. | **Agency Disagrees**<br><br>The Agency continuously updates policy bulletins and procedures to reflect changes in policy. Given the critical nature of moving individuals and families into permanent housing, there may be a delay between implementing a policy change | N/A | N/A | N/A |

2

NYC DEPARTMENT OF SOCIAL SERVICES
OFFICE OF AUDIT SERVICES
CORRECTIVE ACTION PLAN
DRAFT REPORT RESPONSE

Date: 10/11/2024

Audit Name: Office of the State Comptroller – CityFHEPS Rental Assistance Program
Audit Number: 2023-N-1

| Auditor's Recommendations | Agency Response | Responsible Unit | Agency Corrective Action | Target Date |
|---|---|---|---|---|
| | and the recording of it in staff guidance documents. Additionally, as some of the policy changes result in changes within systems, at times the guidance for staff must follow the roll-out schedule of the impacted systems which may trail the change(s) in policy. **State Comptroller's Comment** – It is good internal controls to establish guidance before implementing programs that are funded with taxpayer dollars. As noted in our report, while DSS officials told us that landlords of Augmented CityFHEPS cases are not eligible for Unit Hold Incentives, the 2021 Policy Bulletin related to the administration of the CityFHEPS program does not include this guidance and does not have a process for verifying that Unit Hold Incentives are paid only to eligible landlords. A lack of timely policies and procedures can lead to issues similar to the one highlighted in our report, where, according to the data, 916 Augmented CityFHEPS cases inappropriately received Unit Hold Incentives. We reiterate the importance of updating Policy Bulletins timely when DSS changes CityFHEPS policies and procedures, so staff know how to properly execute important functions. | | | |
| **Recommendation 4:** Establish a process to assist eligible clients in their search to find permanent housing upon issuance of the shopping letter. | **Agency Disagrees** The process for assisting clients in their search for permanent housing occurs on day one, well before the issuance of the Shopping Letter and this assistance continues until the move-out from the shelter occurs. This involves assisting clients with employment, access to case management services, housing specialists, and other social services available through our Agency and non-profit shelter providers. The shelter housing | N/A | N/A | N/A |

3

NYC DEPARTMENT OF SOCIAL SERVICES
OFFICE OF AUDIT SERVICES
CORRECTIVE ACTION PLAN
DRAFT REPORT RESPONSE

Audit Name: Office of the State Comptroller – CityFHEPS Rental Assistance Program
Audit Number: 2023-N-1                                                      Date: 10/11/2024

| Auditor's Recommendations | Agency Response | Responsible Unit | Agency Corrective Action | Target Date |
|---|---|---|---|---|
| | specialists' primary task is to find apartment leads for the clients. The Agency actively searches for housing units in the private market through the DHS apartment search team and the Public Engagement Unit. These apartments are made available to shelter providers on behalf of clients through the HOME Program. The Agency shares best practices with, and provides regular training to, shelter providers to ensure clients move through the housing process expeditiously.<br><br>This housing search occurs within the broader context of the NYC rental market, which currently has a rental vacancy rate of 1.4%, and is considerably lower than 1.4% for affordable rental units. For example, for households searching for units under $1,100, the vacancy rate was only 0.39%. This vacancy rate creates a hardship in finding apartments. Nevertheless, DSS has continued to facilitate moveouts and ensures that our providers and clients work together to access tools that allow clients to exit shelters into permanent housing. Exit plans are tailored to client circumstances and choice (i.e., it may be linked to a school their children are attending or a medical facility where they may be receiving services).<br><br>**State Comptroller's Comment** – DSS provided no evidence that the agency actively supports clients in their search for permanent housing once the Shopping Letter has been issued. In fact, DSS' Policy Bulletin and the Shopping Letters issued to clients state that it is the clients' responsibility to look for and find housing. Additionally, the shelter provider we visited informed us that, while they recommend brokers, it is incumbent on the client to search for apartments. While we recognize the current shortages of | | | |

4

NYC DEPARTMENT OF SOCIAL SERVICES
OFFICE OF AUDIT SERVICES
CORRECTIVE ACTION PLAN
DRAFT REPORT RESPONSE

Date: 10/11/2024

Audit Name: Office of the State Comptroller – CityFHEPS Rental Assistance Program
Audit Number: 2023-N-1

| Auditor's Recommendations | Agency Response | Responsible Unit | Agency Corrective Action | Target Date |
|---|---|---|---|---|
| | affordable rental units, we emphasize that DSS support is imperative. Despite our numerous meetings with DSS officials, there was no mention of the DHS apartment search team and the Public Engagement Unit during the audit or in response to our preliminary reports.<br><br>Overall, DSS has increased permanent housing placements from DHS shelter by more than 20% year over year, which is evidence of the success of the processes in place to assist clients in their housing search despite market conditions. | | | |
| **Recommendation 5:**<br><br>Establish proper internal controls over CityFHEPS payments to landlords, including monitoring of incentives, and recoup any overpayments or improper payments, as warranted. | **Agency Partially Agrees**<br><br>The CityFHEPS payment process has seen major improvements through the use of CurRent. Specifically, CurRent has allowed the Agency to make huge strides in improving controls over landlord payments by streamlining the data entry process. CurRent maintains a separate landlord record, linked to each client, so that if ten clients share the same landlord only one update needs to be made. This ensures accurate information is entered for all related client records, and also ensures that the landlord receives accurate payment.<br><br>The Agency is gradually expanding access to the CurRent landlord portal, which gives landlords the ability to manage their own payment preferences. CurRent also allows the Agency to view all payments made to landlords across all of their tenants, whereas pre-CurRent payments could only be viewed tenant by tenant, which significantly improved our ability to monitor and review.<br><br>Additionally, the DSS Claims and Collections unit reviews data | DHS Rehousing DSS AO Claims & Collections Unit | Agency will review the Unit Hold Incentives case list and recoup, as needed. | 3/31/2025 |

5

NYC DEPARTMENT OF SOCIAL SERVICES
OFFICE OF AUDIT SERVICES
CORRECTIVE ACTION PLAN
DRAFT REPORT RESPONSE

Audit Name: Office of the State Comptroller – CityFHEPS Rental Assistance Program
Audit Number: 2023-N-1

Date: 10/11/2024

| Auditor's Recommendations | Agency Response | Responsible Unit | Agency Corrective Action | Target Date |
|---|---|---|---|---|
| | matches and recovers funds, as appropriate. The Agency has a standard procedure that informs staff and the Landlord Management unit within the DSS Homelessness Prevention Administration (HPA) how to refer a case for investigation and recoupment. See attached procedure for reference.<br><br>Finally, in July of 2024, a specific lease tag was added in CurRent to indicate special circumstances, such as augmented rent. This allows application reviewers and approvers to see clearly if a lease has augmented rent and should not receive a unit hold incentive. In a future release of CurRent the Agency is also planning to add a feature to select a unit hold on leases with augmented rent, to ensure that the unit hold cannot be added to the application in error. This means that there will be a systemic restriction so that augmented rent and unit hold incentives cannot be simultaneously selected. | | | |
| **Recommendation 6:**<br><br>Develop and implement policies and procedures with regards to the administration of Augmented CityFHEPS. | **Agency Agrees**<br><br>The Agency uses updated systems, including CurRent, where the payment process occurs. In addition, there are existing internal processes and a draft workflow that are being finalized and that staff use to manage the Augmented CityFHEPS subsidy process.<br><br>Once again, it is important to note again that policies and procedures often follow the implementation of a new initiative. | DHS Rehousing OPPT | Finalize Augmented CityFHEPS procedure | 3/31/2025 |

NYC DEPARTMENT OF SOCIAL SERVICES
OFFICE OF AUDIT SERVICES
CORRECTIVE ACTION PLAN
DRAFT REPORT RESPONSE

Audit Name: Office of the State Comptroller – CityFHEPS Rental Assistance Program
Audit Number: 2023-N-1

Date: 10/11/2024

| Auditor's Recommendations | Agency Response | Responsible Unit | Agency Corrective Action | Target Date |
|---|---|---|---|---|
| **Recommendation 7:**<br><br>Improve controls related to Subchapter B units, including but not limited to:<br><br>a. Establishing proper policies and procedures related to the administration of Subchapter B units.<br><br>b. Monitoring monthly rent payments to ensure that DSS is only paying for units that are occupied by CityFHEPS clients.<br><br>c. Performing regular physical inspections of units to ensure their habitability for CityFHEPS clients. Coordinate this effort with HPD if necessary.<br><br>d. Ensuring that contractors offer vacant units to eligible CityFHEPS clients as required by Agreements. | **Agency Disagrees**<br><br>OSC misstates the intent of these projects, including how the contract was immediately implemented in the buildings, versus how the contract will function in the buildings long-term, post-construction.<br><br>**State Comptroller's Comment** – Our report does not misstate or discuss the intent of the agreements related to Subchapter B units. It merely states the services the contracted entities must provide in accordance with the agreements.<br><br>The Subchapter B contract helped transition in-place shelter clients to permanent housing tenants by providing residents with leases and CityFHEPS vouchers upon acquisition of the buildings by Neighborhood Restore. Due to the significant rehabilitation scope of the projects, DSS has *intentionally* delayed move-ins for additional tenants until necessary renovations are complete. As tenants need to be relocated for the construction period, moving new tenants into the project at this time would further delay progress. We anticipated that not all units would be occupied pre-construction, and that units which remained unoccupied during construction would not receive a rent subsidy.<br><br>**State Comptroller's Comment** – Our report identified vacant units where DSS continued to pay rent after the unit became unoccupied. As such, we continue to encourage DSS to improve its monitoring related to Subchapter B units.<br><br>The DSS primary goal for this universe of Subchapter B units is | N/A | N/A | N/A |

NYC DEPARTMENT OF SOCIAL SERVICES
OFFICE OF AUDIT SERVICES
CORRECTIVE ACTION PLAN
DRAFT REPORT RESPONSE

Audit Name: Office of the State Comptroller – CityFHEPS Rental Assistance Program
Audit Number: 2023-N-1

Date: 10/11/2024

| Auditor's Recommendations | Agency Response | Responsible Unit | Agency Corrective Action | Target Date |
|---|---|---|---|---|
| | to use project based CityFHEPS to expand the supply of affordable housing. This can be done in two ways. First, the contracts can be used to support acquisition of move-in ready buildings that would otherwise be market rate housing. Alternatively, the contract can help to support the financing package for substantial rehabilitation in conjunction with the Housing Preservation & Development (HPD). In these cases, Subchapter B contracts help to expand the City's portfolio of affordable housing by making a construction loan closing financially viable, so the buildings for existing and future residents exiting from shelter to permanency represent high quality affordable housing. The necessary rehabilitation would not be possible without the project-based rent structure. DSS will be amending and restating contracts to facilitate calendar years 2024 and 2025 loan closings led by HPD. This work is actively underway, but the OSC Report does not reflect the significant effort and time it takes to get deeply distressed occupied buildings to a construction loan closing.<br><br>a. The Agency disagrees with creating policies and procedures for this universe of projects, as the contract will be the long-term governing document for these projects.<br><br>**State Comptroller's Comment** – While we understand the role of the contract, specific policies and procedures could help DSS establish clear and uniform guidance to effectively oversee Subchapter B units and ensure that CityFHEPS clients are placed in safe housing in a timely manner. | | | |

8

NYC DEPARTMENT OF SOCIAL SERVICES
OFFICE OF AUDIT SERVICES
CORRECTIVE ACTION PLAN
DRAFT REPORT RESPONSE

Date: 10/11/2024

Audit Name: Office of the State Comptroller – CityFHEPS Rental Assistance Program
Audit Number: 2023-N-1

| Auditor's Recommendations | Agency Response | Responsible Unit | Agency Corrective Action | Target Date |
|---|---|---|---|---|
| | b. The Agency disagrees as the contract governs how payments will be made to these units and, as stated above, DSS has an existing process for recouping overpayments.<br><br>**State Comptroller's Comment** – Even though the contract governs how payments will be made, as noted in our report, we found payments were not made in line with the contract, as certain vacant units were paid for when they should not have been. As CityFHEPS expenditures have been significantly increasing in recent years, we reiterate the importance of exercising fiscal prudence and accountability and ensuring that the expenses incurred are appropriate.<br><br>c. Any vacancies in these units are intentional and in support of the planned development project. Regular inspections are not part of the CityFHEPS process and are unnecessary for those contracts at this time.<br><br>d. Again, vacancies in these units are intentional and in support of the planned development project.<br><br>**State Comptroller's Comment** – As we highlighted in the report, approximately 20% of Subchapter B units designated for CityFHEPS clients were vacant and not available for occupancy. Given the affordable housing and homelessness crisis, coupled with the extremely low vacancy rates as acknowledged by DSS, we encourage DSS to engage in more direct oversight of those units, including performing periodic inspections to identify units that can be readily made habitable and available to program participants. | | | |

NYC DEPARTMENT OF SOCIAL SERVICES
OFFICE OF AUDIT SERVICES
CORRECTIVE ACTION PLAN
DRAFT REPORT RESPONSE

**Audit Name: Office of the State Comptroller – CityFHEPS Rental Assistance Program**

**Audit Number: 2023-N-1**

Date: 10/11/2024

| Auditor's Recommendations | Agency Response | Responsible Unit | Agency Corrective Action | Target Date |
|---|---|---|---|---|
| **Recommendation 8:** Coordinate efforts with HPD to ensure that Subchapter B unit rehabilitations are completed in accordance with Management and Pre- Development Agreements and in a timely manner. | **Agency Disagrees** DSS is already coordinating with HPD on these development projects but *is not the lead agency*. HPD's closing timelines are based on a variety of factors including availability of city capital, the scope of the project, provider readiness, and private market financing conditions (i.e. interest rates). **State Comptroller's Comment** – Regardless of who is the lead, given the City's significant investment in Subchapter B units and the ongoing affordable housing shortage, it is essential that DSS improve controls over Subchapter B units, as we recommend in the report. We note that the developers entered into contracts in 2021, and 3 years later, there is still no definitive timeline for the rehabilitation work DSS talks about. | N/A | N/A | N/A |

10



**OFFICE OF POLICY, PROCEDURES AND TRAINING**

Department of
Social Services
Human Resources
Administration
Department of
Homeless Services

---

**DSS Policy Bulletin #2023-021**
*Date: November 2, 2023*

**DISTRIBUTION:** *ALL STAFF*

## SUBMITTING REQUESTS TO THE DSS ACCOUNTABILITY OFFICE FOR LANDLORD RECOUPMENT

**Subtopic(s):** Rental Supplement, Rental Recoupment

■ **AUDIENCE**

This policy bulletin is directed at Family Independence Administration (FIA), Homelessness Prevention Administration (HPA), and Department of Homeless Services (DHS) Rehousing Division staff. It is information for all other staff.

■ **PURPOSE**

The purpose of this policy bulletin is to inform FIA, HPA, and DHS staff of the process for submitting requests to the Claims and Collections Division (C&C) of the DSS Accountability Office (DSS-AO) for landlord recoupment.

■ **BACKGROUND**

Rental assistance programs help individuals and families experiencing homelessness, as well as households in the community at risk of experiencing homelessness, find and keep housing by providing monthly rent supplements. The monthly rent supplements are paid directly to the participant's landlord by the New York City Department of Social Services (DSS)/Human Resources Administration (HRA)/Department of Homeless Services (DHS). If the rental assistance program participant notifies DSS/HRA/DHS that they have relocated or if DSS/HRA/DHS staff discovers that the participant is in the process of moving or the landlord is attempting to re-rent the unit but a rent payment has already been made, DSS/HRA/DHS must make efforts to recover the rent payment from the former landlord for periods the recipient did not reside at the premises. This rental recoupment process is handled by C&C.

■ **REQUIRED ACTION**

Staff can refer cases to C&C when the former landlord received the rent check(s) that they were not entitled to. To refer a case to C&C, staff must complete the Landlord Overpayment Referral Form (**CC-143c**) and send it to the Claimsandcollections Mailbox of C&C (claimscollections@dss.nyc.gov).

---

Upon receiving a completed **CC-143c**, a C&C Investigator will review the case to see if a refund of the rent check(s) is necessary. The Investigator will contact the client, the new landlord, the old landlord, and if needed, conduct site visits to the client's previous address.

Once the Investigator has determined that a refund is due to DSS/HRA/DHS, the Landlord Repayment Letter (**CC-143b**) will be sent to the landlord to request payment. If the landlord fails to respond to the letter within thirty (30) days from the date of the letter, or refuses to pay the amount owed, the case may be referred to the New York City Law Department for potential litigation.

Please refer to the Landlord Recoupment Procedure, 2023-12-CC, for details on the recoupment process.

*Effective Immediately*

**RELATED ITEM:**

2023-12-CC

**ATTACHMENTS:**

**CC-143b (E)**    Landlord Repayment Letter (04/12/21)
**CC-143c (E)**    Landlord Overpayment Referral Form (10/06/23)

**NYC** | Department of
Social Services

Human Resources Administration
Department of Homeless Services | Department of Social Services
Accountability Office

CC-143b (E) Rev. 04/12/2021

**INVESTIGATION, REVENUE AND ENFORCEMENT ADMINISTRATION**
**DIVISION OF CLAIMS AND COLLECTIONS**
375 PEARL STREET
NEW YORK, NY 10038
Phone: (718) 557-1344 Fax: (917)-639-0724
Email: claimscollections@dss.nyc.gov

Date: [Date]

[First Name Last Name]
[Address]
[City, State, Zip Code]

Case Number [Case Number]
Re: [Client Name]

Dear [First Name Last Name]:

The Division of Claims and Collections is conducting an investigation concerning Agency issued rent checks that were made payable to you and were cashed by you for the above noted program participant. According to our records, you were not entitled to these monies based on the following reason:

- [ ] The participant left the apartment during the lease
- [ ] The participant resides out of state
- [ ] The participant died on [Date]
- [ ] The participant never moved to the noted apartment
- [ ] The checks in question were duplicated in error by the Agency
- [ ] The building was foreclosed prior to the participant's lease date
- [ ] Security deposit and broker's fee were issued, and participant did not receive apartment
- [ ] Other  [Type Reason]

Time period for which rent checks were cashed: [Date] to [Date]

Total amount of rent checks cashed: $0.00

You are therefore required to repay this money. If you have no objections to making a repayment for the amount noted above please make your check or money order payable to the **Department of Social Services** and mail to:

**New York City Department of Social Services**
**Division of Claims and Collections**
**P.O. Box 414312**
**Boston, MA 02241-4312**

If you disagree that you owe this money or otherwise wish to contest this matter, you can call the number below to schedule an appointment.

**Be advised that failure to make a restitution payment or to contact Investigator [Investigator Name] within thirty (30) days from the date of this letter may result in this matter being referred to our legal department.**

Sincerely,

**Inv or Supv Name**
**[Select Title]**
**929-252-Ext**

CC-143c (E) Rev. 10/06/2023



**Department of
Social Services**
Human Resources Administration
Department of Homeless Services

Department of Social Services
Accountability Office

**INVESTIGATION, REVENUE AND ENFORCEMENT ADMINISTRATION
DIVISION OF CLAIMS AND COLLECTIONS**

## Landlord Overpayment Referral Form

DATE: _____

PROGRAM AREA NAME: _____

### SOURCE INFORMATION
1. Name – First: _____    Last: _____
2. Office Phone #: _____    Email: _____
3. Call back – Date: _____    Time: _____

### CLIENT INFORMATION
1. Name – First: _____    Last: _____
2. Case Number: _____    CIN#: _____
3. Social Security No.: _____
4. Address: _____    State: _____    Zip: _____

### LANDLORD INFORMATION
Current Landlord Name: _____    Phone #: _____    Email: _____
Current Landlord Address: _____    State: _____    Zip: _____
Move in Date: _____    Move out Date: _____

Previous Landlord Name: _____    Phone #: _____    Email: _____
Previous Landlord Address: _____    State: _____    Zip: _____
Move in Date: _____    Move out Date: _____

**Broker Name:** _____    **Phone #:** _____

**Time period for which rent checks were issued:** [Date] to [Date]

**Proposed Total amount of Landlord repayment: $** _____

### REASON FOR REFERRAL
☐ The participant left the apartment
☐ The participant resides out of state
☐ The participant died on [Date]
☐ The participant never moved to the noted apartment
☐ The checks in question were duplicated in error by the Agency
☐ The building was foreclosed prior to the participant's lease date
☐ Security deposit and broker's fee were issued, and participant did not receive apartment
☐ Other *(Explain in Comments section)*

Comments: _____

# Contributors to Report

### Executive Team
**Andrea C. Miller** - *Executive Deputy Comptroller*
**Tina Kim** - *Deputy Comptroller*
**Stephen C. Lynch** - *Assistant Comptroller*

### Audit Team
**Kenrick Sifontes** - *Audit Director*
**Diane Gustard**, CFE - *Audit Manager*
**Dmitri Vassiliev**, CPA - *Audit Supervisor*
**Vance Green** - *Examiner-in-Charge*
**Phoebe Leslie** - *Senior Examiner*
**Steven Townsend** - *Senior Examiner*
**Segun Owomoyela** - *Senior Examiner*
**Mary McCoy** - *Supervising Editor*
**Essence Parker-Chatham** - *Graphics Editor*

**Contact Information**
(518) 474-3271
StateGovernmentAccountability@osc.ny.gov
Office of the New York State Comptroller
Division of State Government Accountability
110 State Street, 11th Floor
Albany, NY 12236



For more audits or information, please visit: www.osc.state.ny.us/state-agencies/audits

12/10/24, 5:53 PM                                        HELP USA

(/)                                                                                    ≡

# Homelessness
# *is not* hopelessness.

Working together for brighter futures behind every door.

GET HELP
(HTTPS://WWW.HELPUSA.ORG/GET-HELP/)

GET INVOLVED

**RECENT NEWS**

## THE 18TH ANNUAL VVA-HELP USA TOY DRIVE BENEFIT LIT UP THE SEASON OF GIVING WITH A SOLD-OUT EVENING!

Each year, VVA and HELP USA unite to host this extraordinary industry event, which is more than just a celebration—it's a powerful fundraiser for HELP USA's youth programs. At the [...]

← →

**We value your privacy.**

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept All", you consent to our use of
cookies.

**Read More (https://helpusa.org/privacy-policy/)**

[ CUSTOMIZE ]    [ REJECT ALL ]    [ ACCEPT ALL ]



(/)                                                                                    ≡

## Committed to communal change.

We work to ensure that everyone has a place to call home.

OUR WORK
(/OUR-WORK/)



**Homelessness Prevention**
➡

(/programs/homelessness-prevention/)



**Transitional Housing**
➡

(/programs/transitional-housing/)



**Permanent Supportive Housing**
➡

(/programs/permanent-supportive-housing/)

**We value your privacy.**

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept All", you consent to our use of cookies.

**Read More (https://helpusa.org/privacy-policy/)**

12/10/24, 5:53 PM                                            HELP USA

NEWS
(/)

# From the heart of our community.

> **VIEW MORE**
> **(/NEWS/)**



(https://www.helpusa.org/artist-shantell-martin-to-design-original-mural-for-
help-usa-purpose-built-homeless-womens-shelter-in-brooklyn-as-the-2025-
art-of-resilience-artist/)

Events

## ARTIST SHANTELL MARTIN TO DESIGN ORIGINAL MURAL FOR HELP USA PURPOSE-BUILT HOMELESS...

Martin to host Art of Resilience Benefit February 7, 2025, at the National Arts Club.
NEW YORK, NY– (December 4, 2024) HELP USA, the renowned national homeless
services provider, and [...]

**We value your privacy.**

We use cookies on our website to give you the most
relevant experience by remembering your preferences and
repeat visits. By clicking "Accept All", you consent to our
use of
cookies.

READ MORE  ❯
(HTTPS://WWW.HELPUSA.ORG/ARTIST-SHANTELL-MARTIN-TO-DESIGN-ORIGINAL-MURAL-FOR-HELP-USA-
PURPOSE-BUILT-HOMELESS-WOMENS-SHELTER-IN-BROOKLYN-AS-THE-2025-ART-OF-RESILIENCE-ARTIST/)

Read More (https://helpusa.org/privacy-policy/)

(/)

≡



(https://www.helpusa.org/publications-conference-presentations/)

General

## PUBLICATIONS & CONFERENCE PRESENTATIONS

A chapter co-authored by HELP Research and Single Adult Services department staff was recently published in Pandemic Preparedness & Homelessness: International Lessons from Covid-19 (Canadian Observatory on Homelessness). It...

**READ MORE  >**
(HTTPS://WWW.HELPUSA.ORG/PUBLICATIONS-CONFERENCE-PRESENTATIONS/)

# Our service is based on our insights.

Explore the hard work that drives the numbers, the stories that lead to success, and the vision that guides our future.

**We value your privacy.**

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept All", you consent to our use of cookies.

**Read More (https://helpusa.org/privacy-policy/)**

**OUR RESEARCH**
**(/CATEGORY/FINDINGS/)**

(/)

≡

GET INVOLVED

# Donate (/donate/)

# Volunte (https://www.volunteermatch.

# Partner (/partner-with-help-usa/)

## Sign Up for Homeward Bound

Keep up with HELP USA's efforts to help lift homeless individuals and improve outcomes for people who may soon experience the loss of their home.

**We value your privacy.**

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept All", you consent to our use of cookies.

Read More (https://helpusa.org/privacy-policy/)

SUBSCRIBE (/NEWSLETTER-SIGNUP/)

(/)

≡

# Stay Connected.

First    Last    Email                SUBSCRIBE

(https://twitter.com/HelpUSA)

(https://www.facebook.com/helpusa)

(https://www.instagram.com/HELPUSA)

(https://www.linkedin.com/company/help-usa)

(/)

HELP USA Intranet    Privacy Policy    Press Information    HELPDevCo

115 East 13th Street New York, NY 10003 (https://goo.gl/maps/RvP9BFerpjcqAhZr8) | Phone: 212-400-7000 (tel:212-400-7000)

© 2024 HELP USA. HELP USA is a 501(c)3 tax-exempt organization. EIN 13-3770118.

This site is protected by reCAPTCHA and the Google Privacy Policy (https://policies.google.com/privacy) and Terms of Service (https://policies.google.com/terms) apply.

**We value your privacy.**

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept All", you consent to our use of cookies.

**Read More (https://helpusa.org/privacy-policy/)**

(/)        ≡

MARCH 14, 2024(HTTPS://WWW.HELPUSA.ORG/2024/03/14/)
GENERAL (HTTPS://WWW.HELPUSA.ORG/CATEGORY/GENERAL/)

# HELP USA'S $129 MILLION INVESTMENT IN EAST NEW YORK OPENS WITH 255AFFORDABLE AND SUPPORTIVE APARTMENTS FEATURING 154 UNITS RESERVED FORFORMERLY HOMELESS ADULTS AND YOUNG FAMILIES WITH CHILDREN.

**We value your privacy.**

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept All", you consent to our use of cookies.

**Read More (https://helpusa.org/privacy-policy/)**

| CUSTOMIZE | REJECT ALL | ACCEPT ALL |



12/10/24, 5:59 PM

Case 1:24-cv-02486-ER    Document 48    Filed 12/18/24    Page 126 of 173

HELP USA's $129 Million Investment in East New York Opens with 255Affordable and Supportive Apartments Featuring 154 Units …

(/)

≡



Public-private partnership between NY City and State agencies, financiers, developers, and nonprofits addresses urgent need for quality supportive housing; demonstrates successful cross-agency collaboration.

**(New York, NY, March 14, 2024)** – HELP ONE Building A & B in Brooklyn, 255 low-income and supportive homes with 154 reserved for individuals and families who have experienced homelessness officially opened today. The $129 million development reflects New York City's and New York State's commitment to expanding access to quality affordable housing, principally for the most vulnerable New Yorkers. Developed by HELPDevCo, with funding from the New York City Department of Housing Preservation and Development (HPD), New York City Housing Development Corporation (HDC), New York

We value your privacy.

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept All" you consent to our use of cookies.

Read More (https://helpusa.org/privacy-policy)

12/10/24, 5:59 PM    HELP USA's $129 Million Investment in East New York Opens with 255 Affordable and Supportive Apartments Featuring 154 Units …

Case 1:24-cv-02486-ER    Document 48    Filed 12/18/24    Page 127 of 173

State Office of Temporary and Disability Assistance (OTDA), Bank of New York Mellon, Regions Affordable Housing, and New York State Energy Research and Development Authority (NYSERDA), the new apartment buildings help fill a dire need for permanent affordable and supportive housing, especially in the East New York section of Brooklyn. Supportive services are contracted with the New York City Department of Health and Mental Hygiene (DOHMH) and in coordination with the New York City Human Resources Administration (HRA).

**New York City Council Member for District 42, Chris Banks said**, "HELP USA's commitment to East New York shines brightly with a significant $129 million investment, marking the inauguration of 255 new apartments. Among these residences, 154 units have been thoughtfully earmarked to provide essential housing for formerly homeless adults and young families with children. This initiative not only addresses the pressing need for affordable housing in the community but also embodies HELP USA's unwavering dedication to supporting vulnerable populations on their journey to stability and self-sufficiency."

**We value your privacy.**

HELP One Building A & B are the first phase of a planned four-building complex that will ultimately add more than 500 affordable apartments and upwards of 2000 new jobs, strengthening HELP USA's long-term commitment to this neighborhood. Upon completion, all residences will share communal spaces, including an open courtyard, a dog park, built-in grills, and various picnic and passive-use areas. "Our administration is focused on solving our housing supply crisis, which also requires ensuring that the most

12/10/24, 5:59 PM
HELP USA's $129 Million Investment in East New York Opens with 255Affordable and Supportive Apartments Featuring 154 Units …

Case 1:24-cv-02486-ER    Document 48    Filed 12/18/24    Page 128 of 173

vulnerable New Yorkers have access to safe, affordable housing and supportive services," said **Deputy Mayor for Housing, Economic Development and Workforce Maria Torres-Springer.** "HELP ONE, built in collaboration with City, State, and private partners, is an example of how many New Yorkers are building together to solve our intertwined needs. Homeless and vulnerable families deserve the quality housing that these 255 homes will provide."

"This administration's dedication to creating secure, affordable housing for New Yorkers in need is deeply reflected in the development of 255 new homes at HELP ONE Building A & B," said **Executive Director for Housing Leila Bozorg**, "Providing housing, supportive services, and community space is core to this project. It is particularly meaningful to see so many homes for formerly homeless families located where shelter used to be, as the first portion of a site that will eventually include over 500 new affordable homes."

"Supportive housing isn't just shelter; it's a lifeline for the most vulnerable New Yorkers, providing stable homes where they can access resources that truly help them thrive," said **HPD Commissioner Adolfo Carrión Jr.** "Help One A&B is HPD's core mission in action: to house every single New Yorker at deeply affordable levels, regardless of income, regardless of age, without exception."

**We value your privacy**

We use cookies to enhance your browsing experience and provide a more relevant experience by remembering your preferences and repeat visits. By clicking "Accept All", you consent to our use of

**Read More (https://helpusa.org/privacy-policy/)**

"The first phase of HELP ONE delivers more than 250 affordable homes, coupled with wraparound supportive services for residents



who have previously experienced homelessness," said **HDC President Eric Enderlin.** "HDC is proud to be a part of this critically important project, and we commend HELP USA for their commitment to serving the housing needs of the East New York community."

"The Health Department is excited to continue our partnership with HELP USA as they expand their efforts to support families as they plan their future and gain skills that promote independence, health, and wellness," said **NYC Health Commissioner Dr. Ashwin Vasan.** "Providing housing and supportive social services to those experiencing homelessness, mental health challenges, and often both is critical as we work to make New York City healthier for all."

The East New York site of HELP ONE is the original location of HELP USA's first family shelter, founded in 1986 by former New York State Governor Andrew Cuomo. Noted in a New York Times article as "the first housing specially built for homeless families in New York State," the original HELP 1 was constructed through a then unprecedented public-private partnership between New York City and New York State government agencies, financiers, developers, and non-profits. Following this transformative transitional housing project, HELP USA began developing permanent affordable housing in 1992, again investing in East New York, constructing Genesis Homes, 150 supportive apartments for families, half of whom were formerly homeless. These models set a national standard presented to Congress and have been widely replicated; their echoes are seen today in the new project nearly 40 years later.

We value your privacy

We use cookies to enhance your browsing experience, serve personalized ads or content, and analyze our traffic. By clicking "Accept All", you consent to our use of

Read More (https://helpusa.org/privacy-policy/)

**HELPDevCo President David Cleghorn** said, "The new HELP ONE site has us o :e stament to the vision of our founders and the strength of the idea that public-private partnerships can and do solve problems. Providing safe, quality housing for people in need is where we started as a company, and it remains our guiding principle today."

"This development in the East New York section of Brooklyn provides urgently needed permanent affordable and supportive housing to formerly homeless adults and young families," said **New York State Office of Temporary and Disability Assistance Acting Commissioner Barbara C. Guinn.** "Supportive housing with on-site access to essential services has the power to transform the lives of some of our most vulnerable fellow New Yorkers. The Homeless Housing and Assistance Program's investment in this collaborative project underscores Governor Hochul's commitment to ensuring that all New Yorkers have access to safe, affordable housing."

Building A, comprising 184 homes with a mix of studios, one-, two-, and three-bedroom apartments, will reserve 60% of units for formerly homeless young families. Building B, comprising 71 homes, including studios and one and two-bedroom apartments, will reserve 60% of its units for formerly homeless adults dealing with mental health and substance abuse concerns. HELP USA will provide supportive services in both buildings through New York City's 15/15 Program.

**We value your privacy**

We use cookies to enhance your browsing experience, serve personalized ads or content, and analyze our traffic. By clicking "Accept All", you consent to our use of

**Read More (https://helpusa.org/privacy-policy/)**

The development of new, high-quality affordable and supportive housing is a crucial step towards connecting more New Yorkers experiencing homelessness to the supportive services and stable housing they deserve," said **DHS Administrator Joslyn Carter**. "With 255 affordable and supportive apartments in total, including 154 units exclusively reserved for New Yorkers who formerly experienced homelessness, the HELP

ONE is poised to provide long-term stability to countless vulnerable New Yorkers."


Designed to meet sustainability standards, the buildings' energy-efficient features include energy recovery ventilators and solar photovoltaics that will improve the building's ventilation and overall air quality, creating healthier living spaces while decreasing energy costs for residents. HELP ONE was awarded $1,000,000 from NYSERDA's Building of Excellence Round 1 Competition and awarded $300,000 from NYSERDA's

Multifamily New Construction Housing Program.


"NYSERDA is pleased to see the completion of HELP ONE, a past winner of our signature Buildings of Excellence Competition," said **Doreen M. Harris, President and CEO of NYSERDA**. "With the incorporation of onsite solar, heat pump technology and other energy efficient features, this clean and carbon neutral-ready multifamily building will ensure that more vulnerable New Yorkers will have access to modern, healthy and

affordable living spaces."

**We value your privacy**

We use cookies to enhance your browsing experience, serve relevant experience by remembering your preferences and repeat visits. By clicking "Accept All", you consent to our use of

**Read More (https://helpusa.org/privacy-policy/)**

12/10/24, 5:59 PM    HELP USA's $129 Million Investment in East New York Opens with 255Affordable and Supportive Apartments Featuring 154 Units ...

Case 1:24-cv-02486-ER    Document 48    Filed 12/18/24    Page 132 of 173

(/)    ☰

...it located on easy access to public transportation, pharmacies, grocery stores, and public parks, the buildings' layout, designed by Curtis + Ginsberg and built by Monadnock Construction, employs trauma-informed design theory to create welcoming spaces that are both useful and beautiful.

**Mark Ginsberg, Partner, Curtis + Ginsberg Architects,** said, "It continues to be an honor working with HELPDevCo and HELP USA, who push the envelope on building design, sustainability, and high-quality housing. They talked with us about all aspects of their needs and operations, sharing input to make the building and the environment as great as possible for residents and the community. This project is the outcome of a
collective effort and sets a new standard for sustainable, affordable, and supportive housing and neighborhood enhancement."

**Greg Bauso, President, Monadnock Construction,** said, "Monadnock is pleased to work with HELP on this project. It marks the latest venture in a more than decade old relationship between our companies that has yielded high quality, affordable housing for vulnerable New Yorkers. Working with HELP gives us an opportunity to impact lives and communities in a way everyone at Monadnock can be proud of. We look forward to another decade of transformative development in East New York, Brownsville and beyond." HELP USA will provide supportive services for residents, including mental health counseling, parenting classes, certified art therapist-led workshops, case management, and employment assistance. Additionally, the on-site staff will facilitate connections to

**We value your privacy**

We and our partners store and/or access information on a device, such as cookies and process personal data, such as unique identifiers and standard information sent by a device for personalised ads and content, ad and content measurement, and audience insights, as well as to develop and improve products. With your permission we and our partners may use precise geolocation data and identification through device scanning. You may click to consent to our and our partners' processing as described above. Alternatively you may access more detailed information and change your preferences before consenting or to refuse consenting.

Please note that some processing of your personal data may not require your consent, but you have a right to object to such processing. Your preferences will apply to this website only. You can change your preferences at any time by returning to this site or visit our privacy policy.

We and our partners process data to provide:

Use precise geolocation data. Actively scan device characteristics for identification. Store and/or access information on a device. Personalised advertising and content, advertising and content measurement, audience research and services development.

We use cookies to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept All", you consent to our use of...

**Read More (https://helpusa.org/privacy-policy/)**

Case 1:24-cv-02486-ER    Document 48    Filed 12/18/24    Page 133 of 173



community resources, anchor the new residents in the
ie a ioci ieii, and provide support to help ensure long-term
housing stability.

**HELP USA President and CEO Dan Lehman**, said, "The HELP ONE complex is centered on the needs of its residents, ensuring they remain stably housed in high-quality, affordable apartments. This focus reflects our history, our present, and our future. Whether that means preventing homelessness, providing transitional housing, or creating a supportive community in permanent housing, HELP USA will be there for those who need us the most. We are grateful to all our partners in realizing these goals."

HELP ONE continues HELP USA's nearly 40-year commitment to combatting homelessness. To date, through HELPDevCo, the agency has developed 29 affordable housing programs across the country – with 1,947 units – which are home to underserved populations, including young mothers, veterans, survivors of domestic violence, people living with HIV, and formerly homeless families and adults. Our work is headquartered in New York and extends to New Jersey, Connecticut, Pennsylvania, Maryland, Washington, DC, and Nevada.

We value your privacy

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept All", you consent to our

Read More (https://helpusa.org/privacy-policy/)







\#

## About HELP USA and HELPDevCo

HELP USA and HELPDevCo work tirelessly to ensure that 30,000 people have a place to call home annually. Since our founding in 1986, we have been dedicated to preventing, responding to, and aiding individuals in recovering from housing insecurity and homelessness. Alongside our 22 shelters and 29 affordable permanent and supportive housing sites, we offer an array of social care programs, including homelessness prevention, job readiness, gender-based violence services, mental health support, childcare, early learning programs, out-of-school-time initiatives for youth, and comprehensive case management services connecting individuals to safety net programs, community resources, and healthcare. For more information, visit www.helpusa.org and www.helpdevco.org.

We value your privacy

We use cookies to enhance your browsing experience, serve personalized ads or content, and analyze our traffic. By clicking "Accept All", you consent to our use of ...

relevant experience by remembering your preferences and repeat visits. By clicking "Accept All", you consent to our use of

Read More (https://helpusa.org/privacy-policy/)

12/10/24, 5:59 PM

HELP USA's $129 Million Investment in East New York Opens with 255Affordable and Supportive Apartments Featuring 154 Units ...

Case 1:24-cv-02486-ER    Document 48    Filed 12/18/24    Page 135 of 173

## About NYSERDA Building of Excellence Program

The Buildings of Excellence Competition, launched in March 2019, is a $58 million initiative that has awarded 65 exemplary multifamily new construction demonstration projects to date. Within the initiative, $2 million in Early Design Support funding has been awarded to architecture and design firms to enhance capabilities to design toward carbon-neutral standards. It is the only competition of its kind, with the awarded projects becoming part of a comprehensive data collection effort that will help determine how to cost-effectively deliver superior performing

buildings that will serve as an essential building block of a carbon-neutral future and advance the design and construction of multifamily buildings. The Competition is administered by NYSERDA with the support of an advisory council comprising a cross-section of experts from the design, real estate and sustainability sectors with partners including American Institute of Architects New York State,

Search ...

ASHRAE and The Real Estate Board of New York. For a complete list of the winning projects statewide, please visit NYSERDA's Buildings of Excellence

website at:www.nyserda.ny.gov/boe

**We value your privacy.**

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept All", you consent to our use of cookies.

**Read More (https://helpusa.org/privacy-policy/)**

12/10/24, 5:59 PM

Case 1:24-cv-02486-ER    Document 48    Filed 12/18/24    Page 136 of 173

HELP USA's $129 Million Investment in East New York Opens with 255Affordable and Supportive Apartments Featuring 154 Units …

## Recent Posts

(/)



**(https://www.helpusa.org/artist-shantell-martin-to-design-original-mural-for-help-usa-purpose-built-homeless-womens-…**

Artist Shantell Martin to Design Original Mural for HELP USA Purpose-Built Homeless Women's Shelter in Brooklyn as the 2025 Art of Resilience Artist….

Publications & conference presentations (https://www.helpusa.org/publications-conference-presentations/)

Demographic trends: HELP USA's increasingly "younger" shelter population (https://www.helpusa.org/demographic-trends-help-usas-increasingly-…

**We value your privacy.**

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept All", you consent to our use of cookies.

**Read More (https://helpusa.org/privacy-policy/)**

12/10/24, 5:59 PM   HELP USA's $129 Million Investment in East New York Opens with 255 Affordable and Supportive Apartments Featuring 154 Units …

Case 1:24-cv-02486-ER    Document 48    Filed 12/18/24    Page 137 of 173

# Stay Connected.

First | Last | Email

**SUBSCRIBE**

(https://twitter.com/HelpUSA)

(https://www.facebook.com/helpusa)

(https://www.instagram.com/HELPUSA)

(https://www.linkedin.com/company/help-usa)

(/)

HELP USA Intranet    Privacy Policy    Press Information    HELPDevCo

115 East 13th Street New York, NY 10003 (https://goo.gl/maps/BvP9BFerpjcqAhZr8)
| Phone: 212-400-7000 (tel:212-400-7000)

© 2024 HELP USA. HELP USA is a 501(c)3 tax-exempt organization. EIN 13-3770118.

This site is protected by reCAPTCHA and the Google **Privacy Policy**
(https://policies.google.com/privacy) and Terms of Service
(https://policies.google.com/terms) apply.

**We value your privacy.**

We use cookies on our website to give you the most
relevant experience by remembering your preferences and
repeat visits. By clicking "Accept All", you consent to our
use of
cookies.

**Read More (https://helpusa.org/privacy-policy/)**

Case 1:24-cv-02486-ER    Document 48    Filed 12/18/24    Page 139 of 173

(/)                                                                    ≡

SEPTEMBER 24,     (HTTPS://WWW.HELPUSA.ORG/2024/09/24/
2024                                )
GENERAL (HTTPS://WWW.HELPUSA.ORG/CATEGORY/GENERAL/),
SOLUTIONS
(HTTPS://WWW.HELPUSA.ORG/CATEGORY/SOLUTIONS/)

# HELP USA SELECTED AS ONE OF FIFTY WORLDWIDE ORGANIZATIONS FOR CITI FOUNDATION'S 2024 GLOBAL INNOVATION CHALLENGE

**We value your privacy.**

We use cookies on our website to give you the most
relevant experience by remembering your preferences and
repeat visits. By clicking "Accept All", you consent to our
use of
cookies.

**Read More (https://helpusa.org/privacy-policy/)**

| CUSTOMIZE | REJECT ALL | ACCEPT ALL |



12/10/24, 6:00 PM
HELP USA Selected as One of Fifty Worldwide Organizations for Citi Foundation's 2024 Global Innovation Challenge | HELP USA

Case 1:24-cv-02486-ER    Document 48    Filed 12/18/24    Page 140 of 173

(/)

☰



The Citi Foundation today announced that HELP USA is one of nine community organizations working across the U.S. chosen for the 2024 Global Innovation Challenge and will receive a $500,000 grant. HELP join's a new cohort of **50 community organizations (https://www.citigroup.com/rcs/citigpa/storage/public/2024-399D%20Global%20Innovation%20Challenge%20on%20Homelessness%2** the world set to receive a collective $25 million in catalytic funding from Citi to address homelessness.

The new funding will allow HELP to pilot a web-based data management platform to increase the capacity, efficiency and accessibility of homelessness prevention programs in the Bronx, New York. HELP currently operates three Homebase programs for the City of New York, providing wrap-around services to prevent

**We value your privacy**

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept All", you consent to our use of cookies.

**Read More (https://helpusa.org/privacy-policy/)**

homelessness and increase housing stability for over 6,500 households annually. The program has an astounding success rate of 95% keeping people housed and out of shelters. With this influx of critical capital, HELP will seek to amplify these results and deliver long-term improvements that can be replicated city-wide.

"HELP USA has been a leader in homelessness prevention for decades, but affordable housing is harder to come by every year," said Dan Lehman, President and CEO of HELP USA. "Through the commitment of visionary organizations like Citi which recognize the importance of PREVENTING homelessness, we can expand the scale and scope of what we do – making sure people remain stably housed and keeping them out of the shelter system."

"Since launching the inaugural Global Innovation Challenge in early 2023, we've continued to see how community-based solutions are poised to accelerate impact on the ground," said **Brandee McHale, President of the Citi Foundation and Head of Citi Community Investing & Development.** "We call this grant support 'catalytic' given the multiplier effect it can have on low-income communities. Each organization will not only directly impact the lives of people in crisis today, but also create models that can be replicated in other communities around the world tomorrow."

"We are providing assistance as quickly as we can to keep people safely housed or rapidly rehouse them, and our efforts are slowed by systems that weren't designed to handle this volume," said **Surena Huggins, AVP, Prevention and Rapid Rehousing, HELP USA.** "With this generous support from Citi, we expect to see an immediate increase in the number of people served, but more importantly, an

We value your privacy.

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept All", you consent to our use of cookies.

Read More (https://www.helpusa.org/privacy-policy/)

Case 1:24-cv-02486-ER    Document 48    Filed 12/18/24    Page 142 of 173

increase in the speed with which we can identify their needs, and provide them with long-term remedies that will result in stability and savings for tenants, landlords, and the City of New York

As a grantee, HELP USA will also have access to a learning community and global network of community organizations working to address this pressing issue. For more information on the Citi Foundation's Global Innovation Challenge, please visit citifoundation.com/challenge

HELP USA's selection for the Citi Foundation's Global Innovation Challenge is a major step forward in expanding our reach and enhancing our impact. Find out more about HELP USA's prevention programs and how we are fighting back against homelessness.

read Citi's press release **here. (https://www.citigroup.com/global/foundation/news/article/2024/citi foundation-selects-nine-u-s-community-organizations-working-locally-to-advance-solutions-to-homelessness-for-2024-global-innovation-challenge)**

**We value your privacy.**

Search ...

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept All", you consent to our use of cookies.

**Read More (https://helpusa.org/privacy-policy/)**

Case 1:24-cv-02486-ER    Document 48    Filed 12/18/24    Page 143 of 173

## Recent Posts

(/)



(https://www.helpusa.org/artist-shantell-martin-to-design-original-mural-for-help-usa-purpose-built-homeless-womens-…

Artist Shantell Martin to Design Original Mural for HELP USA Purpose-Built Homeless Women's Shelter in Brooklyn as the 2025 Art of Resilience Artist.…

Publications & conference presentations (https://www.helpusa.org/publications-conference-presentations/)

Demographic trends: HELP USA's increasingly "younger" shelter population (https://www.helpusa.org/demographic-trends-help-usas-increasingly-…

Stay Connected.

First         Last         Email                    SUBSCRIBE

## We value your privacy.

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept All", you consent to our use of cookies.

**Read More (https://helpusa.org/privacy-policy/)**

(https://www.twitter.com/HelpUSA)

(https://www.facebook.com/helpusa)

(https://www.instagram.com/HELPUSA)

(https://www.linkedin.com/company/help-usa)

(/)

HELP USA Intranet        Privacy Policy        Press Information        HELPDevCo

115 East 13th Street New York, NY 10003 (https://goo.gl/maps/BvP9BFerpjcqAhZr8)
| Phone: 212-400-7000 (tel:212-400-7000)
(7)

≡

© 2024 HELP USA. HELP USA is a 501(c)3 tax-exempt organization. EIN 13-3770118.

This site is protected by reCAPTCHA and the Google Privacy Policy
(https://policies.google.com/privacy) and Terms of Service
(https://policies.google.com/terms) apply.

## We value your privacy.

We use cookies on our website to give you the most
relevant experience by remembering your preferences and
repeat visits. By clicking "Accept All", you consent to our
use of
cookies.

**Read More (https://helpusa.org/privacy-policy/)**

12/10/24, 6:04 PM    Request for 45-day extension to respond to Complaint | Mendez v. Park, et ano., 24-cv-2486-ER (SDNY) - mendez3327@gmail.c...

Case 1:24-cv-02486-ER    Document 48    Filed 12/18/24    Page 145 of 173

jvyas@law.nyc.gov

Compose

| Inbox | 39 |
| Starred | |
| Snoozed | |
| Important | |
| Chats | |
| Sent | |
| Scheduled | |
| Drafts | 74 |
| All Mail | |
| Spam | 6 |
| Trash | |
| More | |

24-05-08 d 1620 ..

**Vyas, Jaimini (LAW)** <JVyas@law.nyc.gov>                    Thu, May 9, 5:45 PM
to me

Good afternoon, Mr. Mendez,

Here is the link to the HPD webpage with resources to apply for a 2% set-aside apartment: https://www.nyc.gov/services-and-information/resources-for-people-with-disabilities.page

Please send me a link (or a copy) to the Local Law 25 you cited at arguments. Thank you.

Best,



**User Name: =**

**Date and Time: = 2024-12-09**

**Job Number: = 240415516**

## Documents (1)

**Client/Matter:** -None-

**Search Terms:** helpusa

**Search Type:** NaturalAnd

**Content Type**                        **Narrowed by**

company-financial                     -None-

1. HELP USA; Zoom Company Information

# *HELP USA; Zoom Company Information*

November 2024

HELP USA

115 E 13th St Fl 17

New York City, New York 10003

United States

## Communications

**Telephone:** (212) 400-7000
**Website:** *www.helpusa.org*

## Company Information

**Employees:** 644

**INDUSTRY-TYPE:** Non-Profit & Charitable Organizations
**CROSS-REFERENCE:** *helpusa*.org

yelp.com/biz/help-support-center-new-york

yelp.com/biz/help-genesis-apartments-las-vegas

HELP USA Inc

Help Usa

Help USA

H E L P Usa Inc

Help Usa Inc
*Helpusa*

Help USA Inc

Help Us Help U Inc

Help -us Help-u Inc

Help Development Corp

Help Inc
*Helpusa* Inc

Help Las Vegas Housing Corp

Help Social Service Corp

HELP USA; Zoom Company Information

Help Us Help U

Help Homeless Service Corp

Help Suffolk

Help USA Genesis

H E L P Development Corp

HELP USA - Inc

HELP USA| Inc

Help

Help - US Help - U Inc

Help Support Ctr

Help Usa - Co

Help Usa Cypress

Help Womens Center

Help an Angel Usa Corp

USA IT Help Inc

HELP USA SSVF Las Vegas

Help - Us Help

Help Crotona Park

Help Crotona Park LLC

Help Railroad Avenue Lofts LLC

Help Suffolk Inc

Help Tax

Help U S A

Help Us Help

Help Us Inc

Help Us Usa Corp

Help Woodycrest LLC

The Help Co

help development Corp

Genesis Apartments

Help USA LLC

Help Usa - Inc

Help Usa LLC

help usa Inc

Bronx Crotona Park North

H E L P Houses Development Corp

HELP USA; Zoom Company Information

H E L P Usa

H E West L P Inc

HELP Development Corp

HELP Equity Homes Inc

HELP Morris

HELP Morris Avenue

HELP USA Supportive Services for Veteran Families (SSVF)
*HELPUSA* Inc

Help - Us Help - U Inc

Help 1 of New York Housing Development Fund Company Inc


## Description

HELP USA works to ensure that everyone has a safe place to call home. We run over 50 programs and residences and have served 500,000 people.


## Market And Industry

**SIC Codes:**

86

861

**Competitors:** *Westhab*
*PATH (People Assisting The Homeless*
*Community Housing Partnership*
*Breaking Ground*
*Shangri-La*
*Mercy Housing Lakefront*
*MidPen Housing*
*Comunilife*
*Housing Hope*
*Low Income Housing Institute*
*Skid Row Housing Trust*
*Hamilton Families*
*New Hope Housing*
*AHC*
*Carrfour Supportive Housing*
*Broadway Housing Communities*
*Mercy House*
*Chrysalis Center*
*Union Station Homeless Services*
*Community of Friends*
*Community Housing Network*
*The Center for Veterans Issues*
*Covenant House*

HELP USA; Zoom Company Information

*HomeFirst*
*Ain Dah Yung Center*

## Financials

**REVENUE:** USD 60,294,000

## Classification

**Subject:** REAL ESTATE DEVELOPMENT (76%)



Zoom Company Information
Copyright 2024 Zoom Information Inc. All RightsReserved

**End of Document**

 LexisNexis·

**User Name:** =

**Date and Time:** = 2024-12-09

**Job Number:** = 240415676

## Documents (1)

**Client/Matter:** -None-

**Search Terms:** helpusa

**Search Type:** NaturalAnd

| Content Type | Narrowed by |
|---|---|
| company-financial | -None- |

1. Help USA Inc.; LexisNexis® Corporate Affiliations™

## Help USA Inc.; LexisNexis® Corporate Affiliations™

December 9, 2024

Help USA Inc.

115 E 13th St

New York, New York 10003

United States
**Metropolitan Statistical Area:** 35620 - New York-Newark-Jersey City, NY-NJ-PA

## Communications

**Telephone:** (212) 400-7000
**Fax:** (212) 400-7005
**Website:** *https://www.helpusa.org*
**E-mail:** *info@helpusa.org*
**Other Communications Information:**
**FACEBOOK:** *www.facebook.com/helpusa*
**TWITTER:** *www.x.com/HelpUSA*
**YOUTUBE:** *www.youtube.com/helpusaadmin*

## Company Identifiers

**DCA NUMBER:** 460098
**FEIN:** 133922973

## Company Information

**Legal Status:** PRIVATE
**Organization Type:** Private
**Employees:**
**NUMBER OF EMPLOYEES:** 50

**IMPORT:** NO
**EXPORT:** NO

## Corporate Structure

*CORPORATE HIERARCHY*

Help USA Inc.; LexisNexis® Corporate Affiliations™

## Executives

**Officers:**

| OFFICER | TITLE TYPE | ROLE(S) | EMAIL/SOCIAL MEDIA |
|---|---|---|---|
| Thomas Hameline, CEO | Executive | Chief Executive Officer | EMAIL: *thameline@helpusa.org* |
| | | | LINKEDIN: *https://www.linkedin.com/pub/tom-hameline/32/44/2b0* |
| Joseph Gallo, CFO | Executive | Chief Financial Officer | EMAIL: *jgallo@helpusa.org* |
| | | | LINKEDIN: *https://www.linkedin.com/pub/joseph-gallo/11/100/903* |
| Missy Flower, Chief Admin Officer | Executive | Chief Administrative Officer | EMAIL: *MFlower@helpusa.org* |
| David Cleghorn, Chief Housing Officer | Executive | Officer | EMAIL: *DCleghorn@helpusa.org* |
| George Nashak, Exec VP | Executive | Executive Vice President | EMAIL: *GNashak@helpusa.org* |
| Frances Pierre, Sr VP-Family Svcs & Day Care Programs | Executive | Senior Vice President | EMAIL: *FPierre@helpusa.org* |
| Ronnie Silverman, Sr VP-Program Dev & Govt Funding | Executive | Senior Vice President | EMAIL: *RSilverman@helpusa.org* |
| Susan Cahill, VP-Grants Mgmt & Contract Compliance | Executive | Vice President | EMAIL: *SCahill@helpusa.org* |
| Fred Goodhartz, VP-Materials Mgmt | Executive | Vice President | EMAIL: *FGoodhartz@helpusa.org* |
| Nancy Nunziata, VP-Trng & Natl Social Svcs | Executive | Vice President | EMAIL: *NNunziata@helpusa.org* |

**Directors:**

| DIRECTOR | TITLE TYPE | ROLE(S) | EMAIL/SOCIAL MEDIA |
|---|---|---|---|
| Maria Cuomo Cole, Chm | Board of Director, Executive | Chairman | EMAIL: *MCole@helpusa.org* |
| Anthony Williams, Vice Chm | Board of Director, Executive | Vice Chairman | EMAIL: *AWilliams@helpusa.org* |

Help USA Inc.; LexisNexis® Corporate Affiliations™

| DIRECTOR | TITLE TYPE | ROLE(S) | EMAIL/SOCIAL MEDIA |
|---|---|---|---|
| Khaliah Ali, Bd of Dirs | Board of Director | | |
| Marc Altheim, Bd of Dirs | Board of Director | | |
| Nick Brown, Bd of Dirs | Board of Director | | |
| Gail Cannold, Bd of Dirs | Board of Director | | |
| Charles Grodin, Bd of Dirs | Board of Director | | |
| Jessica Guff, Bd of Dirs | Board of Director | | |
| Anne Keating, Bd of Dirs | Board of Director | | |
| Peter Hochfelder, Bd of Dirs | Board of Director | | |
| Joanne Leonhardt Cassullo, Bd of Dirs | Board of Director | | |
| Arthur Mirante, Bd of Dirs | Board of Director | | |
| Ponchitta Pierce, Bd of Dirs | Board of Director | | |
| Avis Richards, Bd of Dirs | Board of Director | | |
| Thomas Ridges, Bd of Dirs | Board of Director | | |
| Jeffrey A. Sachs, Bd of Dirs | Board of Director | | |
| Henry Schleiff, Bd of Dirs | Board of Director | | |
| Nancy Seaman, Bd of Dirs | Board of Director | | |
| Richard Sirota, Bd of Dirs | Board of Director | | |

## Description

Help USA Inc. is headquartered in New York, NY. The company is classified as a lessor of residential buildings and dwellings, specializing in individual and family services.

**Industry Type:** Apartment Building Operator

## Market And Industry

**NAICS Codes:**

531110 - Lessors of Residential Buildings and Dwellings

Help USA Inc.; LexisNexis® Corporate Affiliations™

624190 - Other Individual and Family Services
**SIC Codes:**

6514 - Operators of Dwellings Other Than Apartment Buildings

6513 - Operators of Apartment Buildings

6531 - Real Estate Agents and Managers

6519 - Lessors of Real Property, Not Elsewhere Classified

6798 - Real Estate Investment Trusts

8322 - Individual and Family Social Services

## Financials

**SALES:**  USD 10,000,000 - USD 24,999,999

## Classification

**Subject:** REAL ESTATE (90%);  (90%)

LexisNexis® Corporate Affiliations™

Copyright 2024  LexisNexis, a division of RELX Inc., All Rights Reserved

**End of Document**



**User Name: =**

**Date and Time: = 2024-12-09**

**Job Number: = 240415885**

## Documents (1)

    **Client/Matter:** -None-

    **Search Terms:** helpusa

    **Search Type:** NaturalAnd

    **Content Type**                    **Narrowed by**

    company-financial               -None-

    1. H E L P USA Inc; Guidestar

H E L P USA Inc; Guidestar

# *H E L P USA Inc; Guidestar*

October 4, 2024

H E L P USA Inc

115 E 13th St

New York, New York 10003

USA

## Communications

**Telephone:** 212-400-7000
**Website:** *WWW.HELPUSA.ORG*
**Other Communications Information:**
**Link To the Organization's Profile:** *https://www.guidestar.org/profile/13-3922973*

## Company Identifiers

**Employer Identification Number:** 13-3922973

## Company Information

**Tax Year Begin Date:** 2022-07-01
**Tax Year End Date:** 2023-06-30
**Form Year:** 2022
**Form Type:** 990
**NTEE Code:** S50
**NTEE Description:** Nonprofit Management
**Subsection Code:** 03
**Subsection Code Description:** Private Foundations and Public Charities
**Link To the PDF:** *https://pdf.guidestar.org/PDF_Images/2023/133/922/2023-133922973-202401369349308120-9.pdf*

## Executives

**Name of Principal Officer:** TASHA JACKSON

H E L P USA Inc; Guidestar

## Financials

**Fiscal Year End:** 2023

**Firm Name:** BAKER TILLY US LLP
**Total Contributions Received:** USD 3,000,000
**Investment Income:** USD 213,190
**Total Revenue - Current Year:** USD 3,213,190

## Balance Sheet

**Total Functional Expenses:** USD 3,408
**Cash, Savings and Investments EOY:** USD 2,042,969
**Total Assests:** USD 20,915,398
**Total Liabilities:** USD 13,427,659
**Total Net Assets and Fund Balances:** USD 7,487,739

Guidestar

Copyright 2024  Foundation Center DBA Candid,  All Rights Reserved

**End of Document**

FROM:
FRANKLIN MENDEZ
111 SUNKEN GARDEN LOOP
APT. 316
NEW YORK, NEW YORK
10035

UNITED STATES POSTAL SERVICE. Retail

G

US POSTAGE PAID
$8.40
Origin: 10036
12/12/24
3596320032-78

USPS GROUND ADVANTAGE™

0 Lb 15.80 Oz
RDC 01

C099

SHIP TO:
500 PEARL ST
NEW YORK NY 10007-1316

USPS TRACKING® #

9500 1159 8754 4347 6635 15

TO:
PRO-SE OFFICE - SOUTHERN DISTRICT OF N.Y.
500 PEARL STREET
NEW YORK, N.Y. 10007
ATT: HONORABLE JUDGE
EDGAR RAMOS -

RECEIVED
DEC 16 2024
PRO SE OFFICE

RECEIVED
DEC 16 2024
PRO SE OFFICE

"M.S.A.-OK"

SDNY

ReadyPost